E-FILED
Tuesday, 30 August, 2005  01:43:53 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| MARTEL MILLER and PATRICK THOMPSON,<br>Plaintiffs,<br><br>Vs.<br><br>CITY OF CHAMPAIGN, CITY OF URBANA,<br>And CHAMPAIGN COUNTY,<br>Defendants. | Case No. 05-2142 |

FILED
AUG 3 0 2005
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

## IN RESPONSE TO MOTION TO DISMISS PURSUENT TO RULE .12(B)(6)

Now comes Plaintiff Martel Miller and Patrick Thompson ask this honorable court continue with the original 42.U.S.C. 1983 and amendment. Correspondence dated August 24, 2004 from Mike Bily Assistant Chief of Police, Urbana Police Department, was sent to Chris Foster regarding the video tape that Plaintiff Martel Miller and Patrick Thompson submitted on Monday, August 23, 2004, for airing on UPTV. This correspondence from Mike Bily reads, "I will retain the tape until I have the opportunity to speak with Steve". (see attached correspondence). Therefore, the Urbana Police Department confiscated and seized the videotape without a warrant. This seizure violates plaintiff's Fourth Amendment rights to illegal search and seizure of property and First Amendment rights to freedom of speech and freedom of press to freely broadcast documentary to the public. In regards to (04-CF-1571) the Urbana Police Officer Mike Hediger, failed to include a witness that he interviewed in his police report. The interviewing witness and Officer Hediger testified that an interview took place on August 24, 2004. (see attached transcript, pg 193 line 22-24, pg 194 line 1-14, pg 268 -269 and

pg 314 line 6-24). Plaintiffs seek claim in the form of $5,000,000 in personal and business damages in regards to the warrant less seizure of the video tape and violation of plaintiff's first and fourth amendment rights. Finally, plaintiff Thompson, request that an investigation be reopened in case 04-CF-1571 from a non local independent agency or charges be unfounded and dismissed with no arrest record.

WHEREFORE, the plaintiffs request this Court for an order granting the continuance of the complaint.

Plaintiffs

Martel Miller and Patrick Thompson

Martel Miller, 114 E. Park St., Champaign IL, 61820

Patrick Thompson, 723 S. Mattis Avenue, Champaign IL, 61821

### CERTIFICATE OF SERVICE

**The undersigned hereby certifies that on Tuesday, August 30, 2005, service of the foregoing was made by submitting a true copy to the United States District Court for the Central District of Illinois and defendants.**

Howard W. Small, Ansel & Small, Ltd. P.O. Box 468, Champaign IL 61824-0468

Jerome P. Lyke, Flynn, Palmer & Tague, P.O. Box 1517, Champaign IL 61824-1517

David E. Krchak, 30 E. Main PO Box 560, Champaign IL 61824-0560

Plaintiffs

Martel Miller and Patrick Thompson

# Foster, Chris

| | |
|---|---|
| **From:** | Bily, Mike |
| **Sent:** | Tuesday, August 24, 2004 4:55 PM |
| **To:** | Foster, Chris |
| **Cc:** | Adair, Eddie; Connolly, Patrick |
| **Subject:** | Police Video from Miller and Thompson |

Reference our recent conversations about the tape that Miller and Thompson dropped off, due to the recent information in the 08/24/04 News Gazette I think we should hold off on airing this tape until Steve Holz can review the situation. I will retain the tape until I have the opportunity to speak with Steve. I will let you know when we get this resolved.

Michael F. Bily
Assistant Chief of Police
Urbana Police Department
400 S. Vine
Urbana IL 61801
217-384-2331

1

1       THE COURT:  Excuse me, sir, you may not argue with the
2   witness.  Would you ask another question, please.
3   Q.   So by your standards, you're saying that's not
4   considered a stalker?
5   A.   By statute, no.
6   Q.   So what by statute is considered a stalker?
7       MR. VUJOVICH:  Objection, relevance, Judge.
8       THE COURT:  The objection is sustained.  Ask another
9   question.
10  Q.   Okay.  But these were the things that was said, that I
11  have been noticed -- they have noticed me driving around the
12  complex area, and viewing her window, and this is Dawn,
13  correct?
14  A.   That is what the witness stated to me, yes.
15  Q.   And she also commented that she heard me make some type
16  of advances towards Ms. Rahn?
17  A.   Yes.
18  Q.   And as you was talking to Ms. Dawn, did you notice
19  anybody else in the vicinity while you were talking to Dawn?
20  A.   Just, I believe it was me, Officer Eckart, and one of
21  the maintenance people.
22  Q.   Did you interview anybody else?
23  A.   I tried talking to some lady, Dawn told me about
24  another lady, I believe lives in 104 of the same building.

193

```
 1   I went to talk with her, she didn't really want to talk to
 2   me.
 3   Q.   Mm-hmm.  She didn't want to talk to you?
 4   A.   Yes.
 5   Q.   And so you never took her statement at all?
 6   A.   No, I asked her what she knew, and she said she's seen
 7   you in the hall, and she's seen Ms. Rahn in the hall, but
 8   that was it.
 9   Q.   So you didn't interview her, or take any of her
10   statements, or anything?
11   A.   No, she was reluctant, she didn't to want provide me
12   with any information.
13   Q.   And only Dawn approached in the --
14   A.   Yes.
15   Q.   Now that she was very upset, crying, when you found her
16   in the closet area, and she told you the -- what's supposed
17   to have happened?
18   A.   Excuse me?
19   Q.   You stated that she told you the events that's supposed
20   to have took place in that morning?
21   A.   Yes.
22   Q.   And did you -- and she works at the hospital, correct?
23   A.   Yes.
24   Q.   Did you request that she go get any medical attention,
```

1    DEFENDANT MR. THOMPSON:  The identity of the officer,
2    or --
3         THE COURT:  Yes.
4         DEFENDANT MR. THOMPSON:  The identity of the officer.
5         THE COURT:  She said she talked to an officer.  If she
6    knows, could you have her please tell us which officer she
7    talked to, whether anyone else was present, and when and
8    where the conversation took place.
9    Q.   On that day of August 24th, 2003, did you talk to an
10   officer, or did you talk to any officer that day?
11   A.   I talked to an officer.  I mean, it was just one
12   officer.
13   Q.   And what did he ask you?
14   A.   Well, okay.  It was me and a lady named Dawn, we were
15   in Sunnycrest.  And Dawn approached him, so they walked
16   toward his police car, and I guess he took -- or well, he
17   did take a report from her.  Then he came and talked to me,
18   over by my apartment, and took a report from me.
19   Q.   So he actually took a statement from you?
20   A.   Yes, he did.
21   Q.   You actually seen him write the statement down?
22   A.   On a white piece of pad paper, yes.
23   Q.   And what did you tell him?
24   A.   Okay.  Well, the conversation went, he was like, let me

```
 1   ask you a couple of questions.  He asked me, did I know
 2   Stacy?  I told him yes.  He asked me, did I know about what
 3   happened?  And I told him that she called me that morning
 4   and told me what happened.  He asked me did I know you?  I
 5   was like well, we all staying in the same apartment complex,
 6   but no, I have never had a conversation with him, because he
 7   always minds his business, he doesn't say anything to
 8   anybody.  Then he asked me what she told me.  I told him the
 9   story of what happened, what she told me.  And he asked me
10   did I believe her, and I told him no.  And then he was like,
11   made a little statement that I don't, either, I don't
12   believe it either, but I'm just doing my job.
13   Q.   So this is what the officer -- this is what you told
14   the officer, and this is what the officer stated back to
15   you?
16   A.   Yes.
17   Q.   And who else did you talk to about your knowledge of
18   the case?
19   A.   Okay.  Well, who else.  I know that I had made a
20   statement with your wife.
21   Q.   Mm-hmm.
22   A.   And talked to a lawyer, and he recorded what I -- you
23   know, I made the same thing to him, and I talked to him, and
24   he recorded it at that time, but that's the only one.
```

```
 1   Honor?  That's it, your Honor.
 2        THE COURT:  Any other questions, Mr. Vujovich?
 3        MR. VUJOVICH:  Briefly, Judge.
 4                    REDIRECT EXAMINATION
 5   BY MR. VUJOVICH:
 6   Q.   With regard to Michelle Dickey, Officer Hediger, you
 7   said you were directed to Apartment 104 by Dawn Miller; is
 8   that correct?
 9   A.   Yes, I believe it was 104.
10   Q.   And that's where you met with her, and you described
11   her as being reluctant to tell you anything?
12   A.   Yes.
13   Q.   Since that day that you attempted to talk to her and
14   she was reluctant to the present, has she made any contact
15   to contact you to provide any information she may have?
16   A.   No.
17        DEFENDANT MR. THOMPSON:  I object, your Honor.
18        THE COURT:  Overruled.
19   A.   No, she has not.
20   Q.   Has anyone from that apartment complex where the
21   defendant and Ms. Rahn lived contacted you with regard to
22   any information that he may have?
23   A.   No, they have not.
24        MR. VUJOVICH:  Nothing further.
```