**E-FILED**
Wednesday, 29 November, 2006  10:57:09 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| MARTEL MILLER and PATRICK   THOMPSON, VEYA, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | 05-2142 |
| ) | JURY DEMAND |
| CITY OF CHAMPAIGN, CITY MANAGER STEVE CARTER, ) | |
| CITY ATTORNEY FRED STAVINS, CHIEF OF POLICE R.T. ) | |
| FINNEY, DEPUTY CHIEF JOHN MURPHY, DEPUTY CHIEF ) | |
| TROY DANIELS, LT. JOHN SWENSON, SGT. DAVID ) | |
| Griffett, OFFICER JUSTUS CLINTON, OFFICER MICHAEL ) | |
| PYBURN, and UNKNOWN OFFICER, All in Their Individual ) | |
| and Official Capacity, CHAMPAIGN COUNTY, STATE'S ) | |
| ATTORNEY JOHN PILAND, ASST. STATES ATTORNEY ) | |
| ELIZABETH DOBSON, All in Their Individual and Official ) | |
| Capacity, CITY OF URBANA, ASSISTANCE CHIEF OF ) | |
| POLICE MIKE BILY, All in Their Individual and Official ) | |
| Capacity, ) | |
| ) | |
| Defendants. ) | |

## RESPONSE TO MOTION TO DISMISS-ELIZABETH DOBSON

NOW COMES, the Plaintiffs MARTEL MILLER, PATRICK THOMPSON, AND VEYA

INC., by and through their attorneys, ROBERT G. KIRCHNER LAW OFFICE, and in accordance

with Rule 7.1 of this Court files herewith their response to the *12(b)(6) Motion to Dismiss* filed on

behalf of Elizabeth Dobson, and states as follows:

I. Standard of Review

In ruling upon Defendant's *12(b)(6) Motion to Dismiss* this Court must accept the allegations

of Plaintiff's Complaint as true and draw all reasonable inferences therefrom in a light most

favorable to the Plaintiff. (*Triad Associates, Inc. V. Robinson,* 10 F. 3rd 492, 495 (7th Cir.).  If it does

not appear beyond doubt that the Plaintiff cannot establish any set of facts which would entitle him to relief the Court must deny Defendant's *Motion to Dismiss.* (*Hishon v. King and Spaulding,* 467 U.S. 69 (1984)*; Conley v. Gibson,* 355 U.S. 41 (1957).  Additionally, because a Plaintiff need not plead all of the essential facts in his Complaint, the Court must also consider factual allegations which are consistent with the Complaint that are provided by Affidavit, attached Exhibits, or subsequent Briefs. (*Hrubec v. National Ry. Passenger Corp.,* 981 F. 2d 962, 963 (7th Cir. 1992)*; Doe v. First National Bank of Chicago,* 865 F. 2d 864, 873 (7th Cir. 1989).

## II. Statement of Points and Authorities

1. Counsel's Entry of Appearance is sufficient to cure the defect in its "*pro se*" status. (*Scandia Down Corporation v. Euroquilt*, 772 F. 2d 1423 (7th Cir. 1985), *Palazzo v. Gulf Oil Corporation,* 764 F. 2d 1381 (11th Cir. 1985), *K.M.A., Inc. v. General Motors Acceptance*, 652 F. 2d 398 (5th Cir. 1981)

2. No violation of the eavesdropping act occurred. (*In Marriage of Almquist*, 299 Ill. App. 3d 732, 704 N.E. 2d 68 (3rd Dist. 1998); *People v. Ceja* 204 Ill.2d 332, 789 N.E. 1228 (IL 2003); *People v. Ledesma* 327 Ill.App.3d 805, 812, 763 N.E.2d 806 (4th Dist. 2002); *A. Cassidy v. American Broadcasting Companies Inc.* 60 Ill.App.3d 831, 377 N.E.2d 126 (1st Dist. 1978))

3. Dobson is not entitled to absolute of qualified immunity. (*Kijonka v. Seitzinger* 363 F.3d 645 (7th Cir. 2004); *Buckley v. Fitzsimmons* 509 U.S. 259, 113 S.Ct. 2606, 2616 (1993); *Spiegel v. Rabinovitz* 121 F.3d 251, 256-257 (7th Cir.); *Kalina v. Fletcher* 522 U.S. 118, 129-131 (1997); *Burns v. Reed* 500 U.S. 478, 486-487 (1991); *Spurlock v. Thompson* 330 F.3d 791 (6th Cir. 2004))

4. Retaliating prosecutors are actionable regardless of probable cause. (*Duran v. City of*

*Douglas, Arizona*, 904 F. 2d 1372, 1377-1380 (9th Cir. 1989); *Greene v. Barber*, 310 F. 3d 889, 895 (6th Cir. 2002); *Evans v. City of Chicago*, 2003 WL 22232963 (N.D. Ill 2003); *Hartman v. Moore*, 126 S. Ct. 1695 (U.S. 2006), Abrams v. Walker, 307 F. 3d 650, 654 (7th Cir. 2002); *Spiegla v. Hull*, 371 F. 3d 928 (7th Cir. 2004))

5. The seizure of the camcorder and tape is an unlawful prior restraint. (*Channel 10 Inc. V. Gunnarson*, 337 F. Supp. 634 (Dist. Minn. 1972))

### III. Background

At all times relevant hereto Defendant, Elizabeth Dobson, was an Assistant State's Attorney in the Champaign County State's Attorneys Office. (Complaint at pg. 2)  She has been named in her individual capacity and this response addresses the issues raised in a *12(b)(6) Motion to Dismiss filed on her behalf*[#58] in response to the pro se *Amended Civil Complaint* filed by the Plaintiffs April 10, 2006[39].  The Amended Complaint alleges that the Court's jurisdiction arises under §1983 of the Civil Rights Act and that the First, Fourth, and Fourteenth Amendments to the Constitution of the United States were violated by the conduct of the various Defendants. (Complaint ¶5)  The Complaint alleges that Defendant Dobson engaged in a conspiracy with other Defendants which included the filing of charges against the Plaintiffs with the predetermined intention of dropping those charges once the Plaintiffs were "banned" from filming police encounters. (Complaint ¶6)  The Complaint further alleges that a camcorder and tape belonging to Plaintiff Veya were confiscated and the tape was altered and footage destroyed. (Complaint ¶6)  The Compliant alleges that the conspiracy included the filing of charges against the individual Plaintiffs and that during the course of a ride along by Defendant Dobson with Defendant Griffet, Defendant Dobson instructed and authorized Sgt. Griffett to unlawfully seize the Veya Inc. video recorder.

(Complaint ¶16)

More specifically the Complaint alleges that in August in 2004 while Plaintiff Martel Miller was using a camcorder and filming a bicycle traffic stop involving the Champaign Police Officers named herein and James Woods,   the camcorder utilized to film the stop was seized pursuant to the instruction and authorization of Elizabeth Dobson and that thereafter Plaintiff Martel Miller was charged with several counts of eavesdropping (720 ILCS 5/14-2(a)(1)(a)). (Complaint at ¶19)  The Complaint further alleges that at the time of the instruction to Sgt. Griffet by Defendant Dobson, she was acting in her individual capacity as a civilian ride along, and thus not as a prosecutor. (Complaint ¶26)

The Complaint further alleges that Defendant Dobson in the month of July or August of 2004 conspired with Champaign Police officers to unlawfully and maliciously charge and prosecute Defendant Thompson under the eavesdropping statute as the result of the filming of documentary footage by him in August of 2004.  That footage was to be rebroadcast on the Urbana Public Television Station. (Complaint ¶29) As in the earlier incident the complaint alleges that Defendant Dobson was personally present doing a ride along with Defendant Griffett and that following the filming of the documentary footage Plaintiff Patrick Thompson was charged, as Martel Miller had been, with violations of the eavesdropping act. (Complaint ¶29)

The Complaint specifically alleges that Defendant Dobson acted with the express intent and purpose of depriving Patrick Thompson of his First Amendment right to film city and government officials in a public office capacity and that charges filed against him were in furtherance of that conspiracy. (Complaint ¶31)

Thus, the allegations as to Assistant State's Attorney Elizabeth Dobson arise out of her

instructions and authorizations to Champaign Police officers during a ride along engaged in by her in her individual capacity and the subsequent filing of criminal charges pursuant to an alleged conspiracy to interfere with and deprive the Plaintiffs of the opportunity to film the conduct of police officers in open public in the course of performing their law enforcement responsibilities.

Defendant Dobson has filed a 12(b)(6) Motion to Dismiss asserting that she is entitled to absolute and/or qualified immunity and that directing a police officer to seize a videotape and camcorder fails to state a §1983 violation as to Defendant Dobson. (Motion to Dismiss ¶8) Count II of the *Amended Complaint* is sought to be dismissed by the assertion of both absolute and qualified immunity and on the basis that the direction to seize a videotape and camcorder fails to state a §1983 violation as to Defendant Dobson. (Complaint¶11) Count III of the *Amended Complaint* is sought to be dismissed on the same absolute and qualified immunity theories and on the further assertion that interference with Patrick Thompson's documentary filming of police activity does not constitute a basis for a claim against her. (Complaint ¶14)

Attached to Defendant Dobson's *Motion to Dismiss* is copy of Senate debates with respect to the Illinois Eavesdropping Statute and Senate Bill 1352.  No affidavits or documentary evidence of a factual nature are presented in support of Defendant Dobson's 12(b)(6) motion.  Filed herewith are the affidavits and supporting materials of Plaintiff's Martel Miller and Patrick Thompson.  Those affidavits, together with the allegations of Plaintiff's pro se *Amended Civil Complaint* are properly before this Court and may be considered by it in response to Defendant's *Motion to Dismiss*. (*Hrubec v. National Ry. Passenger Corp.*, 981 F. 2d 962, 963 (7th Cir. 1992); *Doe v. First Nation Bank of Chicago*, 865 F. 2d 864, 873 (7th Cir. 1989)) The affidavits of Plaintiffs Martel Miller (EXHIBIT N) and Patrick Thompson (EXHIBIT M) more fully illuminate the conduct of Defendant

Dobson as described below.

On or about March 26, 2004, Plaintiffs Patrick Thompson and Martel Miller, as leaders of VEYA, Inc. mailed correspondence addressed to Champaign Police Chief Finney explaining that the organization would be monitoring the police. (EXH. M, p.2). The letter includes the following statement: "If you have any questions or concerns, you may contact us at: veya@lists.cu.groogroo.com" (EXH. M, p.2) Both Martel and Patrick have access to the email listed above, checked it regularly, and never received any comments from any officers, the City, or anyone else raising any concerns or questions about the videotaping. (EXH. M, P. 2, EXH. N, p. 2) Additionally, no one ever contacted either Patrick or Martel after this letter was sent about any concerns they had about monitoring the police or the project. (EXH. M, P. 2) The correspondence mailed to Police Chief Finney was signed by Martel Miller, and a copy of that correspondence was mailed on or about March 26, 2004 to City of Champaign Mayor Gerald Schweighart and City of Champaign City Manager Steve Carter. (EXH. M, P. 2)

On or about the first of May, 2004, Martel Miller and Patrick Thompson held a public forum at which they discussed their project to monitor police and citizen interactions. (EXH. M, P. 2) Many officers, including Defendant Griffet, and other community members were present at the forum. I believe I told the audience that we were going to be taping interactions between the police and citizens, and putting it on UPTV. (EXH. M, P. 2) The forum that was held on their program to monitor police and citizen interactions was broadcast on UPTV from May through June, 2004. (EXH. M, P. 2)

At no time did any of the officers, including those present at the forum, or any other public official present at the forum, voice any displeasure or objection to our intent to tape the police

interactions with local citizens until the tape and camcorder were confiscated on August 7, 2004.(EXH. M, P. 2) In fact, prior to beginning the videotaping, Martel and Patrick met with Mayor Schweighart.  (EXH. M, P. 2)  He asked us what the letter that we sent him (on March 26, 2004) was about, and Martel and Patrick told him that they were going to be taping the police interactions with citizens.  (EXH. M, P. 2) Mayor Schweighart said he didn't have any problem with them doing that.(EXH. M, P. 2)

Patrick and Martel had several interactions with Champaign, Urbana, and University police officers between Memorial Day Weekend, 2004 and August 7, 2004 while Patrick and Martel were taping the officers' interactions with local citizens. (EXH. M, P. 2-3, EXH. N, P. 2-3) The police officers, including Officer Griffet and Urbana Police Officer Anthony Cobb saw Patrick and/or Martel taping them and talked with them while Patrick and Martel were taping. (EXH. M, P. 3, EXH. N, P. 3)

While taping, both Patrick and Martel were cautious to never incite any individuals in their interactions between officers and citizens. (EXH. M, P. 3, EXH. N, P.3) There was never more than one person taping for VEYA at a time.   (EXH. M, P. 3, EXH. N, P.3) In fact, other than Nikki Lamers taping a scene on the University of Illinois campus, all of the rest of the taping for VEYA was conducted by either Patrick or Martel Miller.  (EXH. M, P. 3, EXH. N, P.3)

Both Patrick and Martel made a conscious effort to not interfere with any police/citizen action by waiting to speak with any citizens until after the police/citizen interaction had ended. (EXH. M, P. 3, EXH. N, P.3) Throughout our taping of police interactions with local citizens, both Patrick and Martel conducted themselves out in the open where everyone could see them and could see what they were doing.  (EXH. M, P. 3, EXH. N, P.3) They also took precaution to not interfere

with any of the officers' interactions with the citizens by waiting to interview citizens, and even talk with officers, until after the officers had concluded their interactions with the citizens.

Throughout their interactions with the police – from the letter to Chief Finney, their conversation with the Mayor, their conversations with various police officers including Officer Griffet, and the lack of any communication from any officer noting any dissent made both Patrick and Martel believed that they had permission to video and audio record the officers' interactions, including Officer Griffet's.  (EXH. M, P. 3, EXH. N, P.3)

On June 29, 2004, at approximately 2 am, Patrick Thompson was standing in the parking lot of Mac's, and videotaped a traffic stop that involved three officers.  (EXH. M, P. 5)  Thompson was more than 100 feet away from the traffic stop while he was taping the stop.  (EXH. M, P. 5)  As he was taping the traffic stop, a crowd began to form in front of Mac's.  (EXH. M, P. 5)  Within thirty seconds of finishing filming of the traffic stop, Thompson turned the camera toward the crowd forming at Mac's.  (EXH. M, P. 5)  He began taping the crowd and had conversations while he was taping, with some of the people in the crowd.  (EXH. M, P. 5)  While taping, he also saw and videotaped Elizabeth Dobson videotaping the same scene of events that he was taping.  (EXH. M, P. 5)  Thompson does not know if she was recording any voices because he has not seen the videotape she made.  (EXH. M, P. 5)  During his taping, he noticed Officer Griffet yelling at a man whose name he later learned to be Allen Wilson.  (EXH. M, P. 5)  They did not appear to be having a private conversation, since Griffet was yelling and swearing at him, and Mr. Wilson was yelling back.  (EXH. M, P. 5)  At one point in their conversation, you can hear Allen referring to Griffet having 'his boys', referring to the officers), look like they were ready to jump him (Mr. Wilson).  (EXH. M, P. 5)  Two other officers were present and in the crowd that Thompson was taping.

(EXH. M, P. 5)   Despite Thompson's presence with his camcorder, none of the officers, including Officer Griffet, nor Assistant State's Attorney Dobson, asked him to stop taping them or the scene. (EXH. M, P. 5)

In addition to taping Defendant Griffet on June 29, 2004 at Mac's, Thompson has videotaped him on two other occasions since June 29, 2004.    (EXH. M, P. 5) Despite these three times that Thompson videotaped him and he was aware of Thompson taping him, he never approached Thompson or otherwise contacted him to request that he not audio or video tape him or to even suggest any displeasure at Thompson taping him and his interactions with other people.  (EXH. M, P. 5)

On September 2, 2004, Patrick Thompson was charged by the Champaign County State's Attorney's office with Eavesdropping.  (EXH. M, P. 6) (A copy of the Indictment is attached hereto as EXHIBIT G.)  Thompson believes that the charges were filed against him in retaliation for his filming Dobson on June 29, 2004, when she was filming the same crowd that he was filming and for exposing Dobson's ride alongs with Griffet.  (EXH. M, P. 6) According to news articles, Dobson stopped doing 'ridealongs' after Martel and he were charged with eavesdropping .

On August 7, 2004, Martel Miller was driving on Bradley Avenue when he observed two police cars and officers talking with a bicyclist, who he later found out to be James Wood.  (EXH. N, P. 3-4) This was in the 900 Block of west Bradley Avenue in Champaign. Wood and the officers, whom he later found out to be Officers Clinton and Pyburn) were on the south side of the street. (EXH. N, P. 3-4) Miller  parked his vehicle and went to the sidewalk on the north side of the street and began taping the stop that had already begun.  (EXH. N, P. 3-4) He was approximately 60 feet away from the traffic stop while he was taping the officers' interactions.  (EXH. N, P. 3-4)  Cars

continued to travel east and west across Bradley Ave between where he was taping and the officers were talking with Wood. No voices of the officers or Wood were audible during the traffic stop. (EXH. N, P. 3-4)

After the stop ended, Officer Pyburn drove away in his car. (EXH. N, P. 4) Officer Clinton returned to his car but did not leave the scene. (EXH. N, P. 4) As Wood was leaving, Miller motioned for Wood to come over, which Wood did. (EXH. N, P. 4) Miller requested and got consent from Wood to tape an interview with Wood. (EXH. N, P. 4) About 2-3 minutes into the interview of Wood, Officer Clinton drove over to the north side of the street and from his car, yelled at Miller, "Are you taping my voice right now?"(EXH. N, P. 4) As Miller continued the focus of his camera and the interview on Wood, Miller responded that Clinton was placing his voice on the tape. (EXH. N, P. 4) Clinton said to Miller: "You're taping my voice without my permission." (EXH. N, P. 4) An additional officer came at a high rate of speed in his vehicle and got out of his squad car. (EXH. N, P. 4)

This officer, who Miller later learned to be Officer Cleeve, told Miller to stop filming, so Miller handed the camera to Wood and told Wood to start filming me. (EXH. N, P. 4) Miller heard officer Cleeve tell Wood that if he didn't stop taping, he'd be arrested. (EXH. N, P. 4) Miller told Wood to give the camera back to him, which Wood did. (EXH. N, P. 4) Miller told Clinton and Cleeve that he and Patrick Thompson had been filming for two months and there had been no problem. (EXH. N, P. 4) Officer Cleeve told Miller that he was told recently that if any of the officers saw him or Patrick filming, to question us. (EXH. N, P. 4) Miller asked the officers to call a sergeant to the scene. (EXH. N, P. 4) Officer Griffet arrived about ten minutes later. (EXH. N, P. 4) Miller heard Officer Clinton complain to Griffet that his voice was on the tape without his

permission. (EXH. N, P. 4) Miller explained to Griffet that Clinton's voice was only on the tape during his interview of Wood. (EXH. N, P. 4) At all times that Clinton's voice was on the tape, the camera was pointed at Wood (for Wood's interview) (EXH. N, P. 4)

Miller believes that Clinton intentionally put his voice on the tape by yelling at Miller while he was interviewing Mr. Wood to justify an arrest, confiscation, and indictment of Miller. (EXH. N, P. 4)

Miller offered to show Griffet the traffic stop and Griffet viewed it. (EXH. N, P. 4)  There was no audible voice of any officer or Wood during the traffic stop on the tape that Griffet viewed. (EXH. N, P. 4) After viewing that portion of the tape, Griffet went back to the car and talked with Dobson for about one minute. (EXH. N, P. 4) Griffet returned and reported that Dobson told him that he could take the camera and tape. (EXH. N, P. 4)

Miller told Griffet and the other officers that the camera was no evidence, only the tape, so they should just take the tape, but Griffet ordered that both the camera and the tape should be seized. (EXH. N, P. 4) When Griffit took the camera from Miller , Miller asked him if he was going to arrest him, and Griffet answered, No. (EXH. N, P. 4)

Officer Griffet informed them that Assistant State's Attorney Dobson, who he said was in the police car several feet away from where we were standing, had informed him that he had the right to seize both the camera and the videotape inside the camera, which he then instructed other officers to do. (EXH. N, P. 4)

Miller believes that Griffet and other officers were aware of the videotaping and consented to that also because of Griffet's grand jury testimony in which he states that he and other officers have been aware that there were citizen watch groups watching police actions and police interaction

with citizens, and that no one had expressed any concern about that taping until the night of August

7, 2004. (EXH. N, P. 4).

    The only voice other than Martel's and Wood's on the tape that Griffet viewed was the part

where Clinton yelled at Martel while he was interviewing Wood.  (EXH. N, P. 4)  There was no

voice of Wood or an officer audible when Griffet viewed the tape with Martel that night. (EXH. N,

P. 4)

    Defendant Dobson has filed a Memorandum of Law in support of her Motion to Dismiss.

Initially, Defendant Dobson asserts that Veya, Inc. is claims should be dismissed because Veya, Inc.

is not represented by counsel.  Defendant Dobson cites *Mendenhall v. Goldsmith*, 59 F. 3d 685, 687

(7th Cir. 1995).  The undersigned has now entered an appearance on behalf of Veya, Inc.  and

Defendant Dobson's Motion to Dismiss in this regard should be denied. (*Scandia Down Corporation

v. Euroquilt*, 772 F. 2d 1423 (7th Cir. 1985), *Palazzo v. Gulf Oil Corporation,* 764 F. 2d 1381 (11th

Cir. 1985), *K.M.A., Inc. v. General Motors Acceptance*, 652 F. 2d 398 (*5th* Cir. 1981)

    With respect to the substantive aspects of the claims brought against Defendant Dobson she

acknowledges the distinction between the advocacy role for which she is entitled to absolute

immunity and the administrative role which includes giving legal advice to the police and which has

been deemed to be administrative and thus subject to only qualified immunity. (Memorandum of

Law, Defendant Dobson at pg. 3) Defendant Dobson then argues that in assessing her claim of

qualified immunity the Court must consider whether the Plaintiff has asserted a violation of a

Federal Constitutional Right and whether the standards implicated were clearly established at the

time in question. (Memorandum of Law, Defendant Dobson at pg. 3) The "factual basis" for

Defendant Dobson's claim of immunity with respect to the seizure of the videotape and camcorder

is premised upon her claim that the camcorder and tape constituted "evidence in plain view of a crime" (Memorandum of Law, Defendant Dobson at pg. 3) The asserted criminal offense for which the videotape and camcorder are claimed to be "evidence in plain view of a crime" is the Illinois Eavesdropping Statute. (720 ILCS 5/14-1 et. shu.) (Memorandum of Law, Defendant Dobson at pg. 3)

Defendant Dobson asserts that Public Act 88-677 which added the definition of "conversation" to the eavesdropping statute, broadens the prohibition against recording of any conversation without the consent of all parties, regardless of any expectation of privacy. (Memorandum of Law, Defendant Dobson at pg. 5)

Defendant Dobson asserts in her Memorandum of Law that it was reasonable for former Assistant State's Attorney Dobson to believe that the exception contained in sub-section H of the Eavesdropping Statute did not apply to anyone other than a law enforcement officer and that although she instructed and authorized the seizure of the videotape and camcorder because the police officers to whom she gave this order were not obligated to follow that order she has absolved the responsibility. Curiously the Officers claim they are absolved of liability because they followed her direction.

*In Marriage of Almquist*, 299 Ill. App. 3d 732, 704 N.E. 2d 68 (3rd Dist. 1998) the Appellate Court, while noting that the expectation of privacy was no longer the determinative factor, also noted that it was not the intent of the legislature to provide a definition of "conversation" so broad as to encompass any audible expression whatsoever and that the statute is directed to only "recording of conversation" (*Almquist* at 737).

The citation by Defendant Dobson to *Anderson v. Simon*, 217 F. 3d 472 (7th Cir. 2000) directs the readers attention to page 476. (Defendant Dobson's Memorandum of Law at pg. 6) *Anderson* does discuss the absence of evidence in that case to demonstrate that the police were under

any duty to follow the State's Attorneys orders or suggestions at issue therein. The Court does not discuss the rule of causation relevant to a §1983 analysis which provides that any person who has caused the constitutional deprivation may be held responsible.

The remainder of Defendant Dobson's Memorandum of Law incorporates the same arguments and theories as to Counts II and III(Defendant Dobson's Memorandum of Law at pg. 6) and further asserts that Defendant Dobson is entitled to absolute immunity with respect to the filing of charges.

It is of significance that Defendant Dobson's motion before the Court is brought pursuant to 12(b)(6) and that it has been filed without supporting documentation, including affidavits. The parameters of Defendant Dobson's involvement as recited above, went well beyond simply giving legal advice to law enforcement (an administrative function); well beyond an independent assessment of whether the eavesdropping statute had been violated; and whether Plaintiff's should be charged as a result of that.

Before addressing specifically the scope of the law pertaining to the eavesdropping statute and the First Amendment activities of the Plaintiffs, it is helpful to briefly review the parameters of the absolute immunity afforded to prosecutorial functions as the conduct and activities of Defendant Dobson do not fall within those protected parameters. In *Kijonka v. Seitzinger* 363 F.3d 645 (7th Cir. 2004) the Court noted that the absolute immunity of a prosecutor does not extend to giving legal advice to the police when they are investigating whether a crime has occurred. In rejecting Rietz' qualified immunity Defense, the Court noted that no reported Illinois case had found the elements of an assault satisfied in any case that was factually similar to the one before it. "This dooms Rietz' defense at qualified immunity" (*Kijonka* at 648). Furthermore, the Court noted that no Illinois prosecutor could have reasonably believed that Kijonka had committed a crime. When functioning

as an investigator- in determining probable cause, a prosecutor is afforded no greater protection than that of a police officer participating in a pre-arrest investigation. Thus, if a prosecutor plans and executes a raid on a suspected weapons cache, he/ she "has no greater claim to complete immunity than activities of a police officer allegedly acting under his direction" (*Buckley v. Fitzsimmons* 509 U.S. 259, 113 S.Ct. 2606, 2616 (1993)).

It is true, however, that when a prosecutor acts in his or her capacity as "advocate for the State", as opposed to an administrative or investigative function, absolute immunity applies. (*Buckley v. Fitzsimmons* 509 U.S. 259, 113 S.Ct. 2606, 2616 (1993); *Spiegel v. Rabinovitz* 121 F.3d 251, 256-257 (7th Circuit)) When a prosecutor, however, vouches for the truth of facts that support probable cause for an arrest warrant, she has lost that absolute immunity. (*Kalina v. Fletcher* 522 U.S. 118, 129-131 (1997). Thus, in *Buckley v. Fitzsimmons* 509 U.S. 259, 113 S.Ct. 2606, 2616 (1993) a prosecutors efforts to determine whether a boot print at the scene of the crime had been left by a suspect were investigative and not entitled to absolute immunity.

While Plaintiffs concede that a mere review of evidence and the process of deciding to pursue charges has been held to be a quasi-judicial act affording absolute immunity (*Spiegel v. Rabinovitz* 121 F.3d 251,  (7th Circuit) at 257), the conduct of Elizabeth Dobson as reflected in the affidavits filed herewith, clearly constituted a constituted an abdication of that prosecutorial function and decision making to the "command staff" at the Champaign Police Department. It should be noted that the burden of proving an entitlement to absolute immunity resides with the prosecutor (*Burns v. Reed* 500 U.S. 478, 486-487 (1991)). Thus, where the prosecutorial function as an advocate has not yet begun- *i.e* prior to an indictment- absolute immunity has been held to be not applicable. (*Spurlock v. Thompson* 330 F.3d 791 (6th Cir. 2004) The conduct of Defendant Dobson

during a civilian ride along and her assumption of a role of giving advice to law enforcement officers "on the street" in the process of an investigation and determining whether probable cause existed, clearly fall outside the scope of absolute immunity. The facts which are to be developed during the course of discovery are essential in determining whether qualified immunity is applicable. The facts before this Court reveal a series of conversations and communications with command staff at the Champaign Police Department and the procuring of reports from the University of Illinois Police Department in an effort to support the bringing of charges which were ultimately authorized through State's Attorney John Piland. The Affidavit of Elizabeth Dobson herself, filed herewith as EXHIBIT C, reflect how far beyond the role of prosecutorial immunity she had gone under the facts of this case.

For example, in *Marrero v. City of Hialeah* 625 F.2d 499 (5th Cir. 1980), the Court held that when a prosecutor acts as an investigator by accompanying police and participating in an execution of a warrant, absolute immunity is not appropriate. How does conduct in a civilian ride-a-long then qualify? It is clear that controlling the prosecutorial function includes deciding whether to prosecute and the delegation of that function may in fact violate due process. (*Person v. Miller* 854 F.2d 656, 664 (4th Cir. 1998); *East v. Scott* 55 F.3d 996 (5th Cir.1995); *Erickson v. Pawnee County Board of County Commissioners* (10th Cir. 2001). Yet this is precisely what Defendant Dobson did.

The development of witness testimony prior to the commencement of a prosecution has also been held to be beyond the role of acting as an advocate for the state. (*Spurlock v. Thompson* 330 F.3d 791 (6th Cir. 2004) Yet Defendant Dobson orchestrated and secured reports from the University of Illinois police department to be able to commence to Champaign Police Department to "authorize" prosecution.

Thus, it is clear that the dividing line between absolute and qualified immunity is specific to the functions being served by the prosecutor claiming that immunity and that the burden of proof rests upon him or her. That burden has not been met.

Defendant Dobson does discuss the parameters of the Illinois Eavesdropping Statute and thus, a further discussion of that issue is appropriate in this response.

In *People v. Ceja* 204 Ill.2d 332, 789 N.E. 1228 (Illinois 2003), the Illinois Supreme Court addressed the post-amended version of the Illinois Eavesdropping Statue and held that no violation of that statute occurs when the individuals are aware that their statements are being monitored. The Court characterized this as acquiescence in an implied consent to monitoring when the communications continue despite the knowledge that they were being monitored. (*Ceja* at 349) Specifically, the Court noted that the controlling principals have been widely recognized and that the element of consent may be satisfied either expressly or by implication. Consent exists when a persons behavior manifests acquiescence. Implied consent, the Court stated, is consent in fact which is inferred from the surrounding circumstances indicating that the party knowingly agreed to the surveillance. Although the circumstances relevant to an implication of consent will vary from case to case, language or acts that tend to prove a party knows of or assents to encroachments of the routine expectations, conversations of private are sufficient. The Court specifically noted the visibility of the speakers as a factor in determining consent. (*Ceja* at 349-350) As demonstrated by the facts presented herein. The Plaintiffs notified the City of Champaign Police Department of their intent to produce a documentary depicting the activities of the Champaign Police Department and it's officers and, in particular, their involvement in traffic stops. (See also EXH N, ¶ 4 p. 1-2 , ¶ 10 P. 2, ¶ 19 P. 2-3 ; EXH. M, p. 2, and EXH .A)  That letter was received and acknowledged by the

2:05-cv-02142-HAB-DGB    # 87    Page 18 of 24

command staff and City officials and it is clear from the factual information provided herewith, that specific officers, including Officer Griffett, had full knowledge and awareness of the monitoring of their activities in conjunction with the production of this documentary. Additionally, Griffet, in the documentary tape, speaks with Miller while he is filming and Officer Griffet telling Miller he had no problem with the taping that was taking place.  (EXH. N ¶¶ 18, 19, P. 2) Thus, at the very least, a factual issue is presented which should entitle the Plaintiffs to pursue discovery to demonstrate the scope and knowledge of Defendant Dobson with respect to the consent at issue on the stops during which she was involved. It is also significant to note that Sargent Griffet has advised this Court that at the time of the occurrence involving him, he was a part-time employee in the State's Attorney's Office for which Ms. Dobson was an assistant. (See Affidavit of Sgt. David Griffet attached to his Motion for Summary Judgment, filed May 23, 2006.)

These same principles were applied by the Appellate Court in *People v. Soto* 342 Ill.App.3d 105, 796 N.E. 690 (2nd Dist. 2003).

Thus, as early as 2003 the law had been established by the Illinois Supreme Court and an Appellate Court that the type of consent required to avoid liability under the Eavesdropping Statute existed under circumstances akin to that presented herein. Moreover, accidental overhears of recordings of a conversation clearly do not violate the Eavesdropping Act. (*People v. Ledesma* 327 Ill.App.3d 805, 812, 763 N.E.2d 806 (4th Dist. 2002)) The post-amendment principles were entirely consistent with earlier precedent and clearly should have placed a seasoned prosecutor on notice. Moreover, comments by Defendant Dobson to the Grand Jury in which she advised that it was perfectly okay to videotape your kids but perfectly improper to videotape the police, call into question her entitlement to qualified immunity.(See EXH. E, P. 8)(See *People v. Calvert* 258

Page 18 of  24

Ill.App.3d 504, 629 N.E.2d 1154 (5th Dist. 1994)

Although the Defendant distinguishes *People v. Beardsley* 115 Ill.2d 47, 503 N.E.2d 346 (Illinois 1986) by asserting the amendment of the statute after the issuance of the decision, a careful reading of that decision notes that its foundation and rationale stems from the United States Supreme Court decision in *Lopez v. United States* (1963) 373 U.S. 427 and that the harm sought to be remedied is the surreptitious interception of communications. (*Beardsley* at 58; See also *People v. Cole* 186 Ill.App.3d 102, 542 N.E.1145 (5th Dist. 1989); *A. Cassidy v. American Broadcasting Companies Inc.* 60 Ill.App.3d 831, 377 N.E.2d 126 (1st Dist. 1978))

Of particular note in *A.Cassidy* is that the audio recording was no more extensive than what was able to be heard by those present. *(A. Cassidy* at 835) As reflected by the Affidavits filed herewith, at the time of the seizure of Plaintiffs' camcorder and tape and the interference with the individual Plaintiffs filming of the documentary (a First Amendment and protective activity), there was not simply an absence of probable cause – there was no cause for the officers involved or Defendant Dobson to have concluded that a crime had been committed. There is no audio portion of the August 7, 2004 traffic stop by Miller, only video. (EXH. N, ¶ 32, p. 33-34).  With regard to the taping by Thompson on June 29, 2004 at Mac's, the taping of the crowd scene was just that – taping a crowd scene. (EXH. M, ¶ 44, P. 5) At all times, Thompson was clearly visible and was not trying to abscond himself. (EXH. M, ¶44, P.5) What Dobson may not have been happy about was that she herself was 'caught' by Thompson videotaping the same crowd that he was taping. (EXH. M, ¶44, P.5)

Before turning to a discussion of the First Amendment issues as it relates to the videotaping and the production of a documentary regarding police conduct a brief response to the blanket and

unsupported assertion of immunity with respect to the filing of charges is appropriate.  Retaliatory

prosecutions are subject to remedy under §1983.  Regardless of the existence of probable cause!

(*Duran v. City of Douglas, Arizona*, 904 F. 2d 1372, 1377-1380 (9th Cir. 1989); *Greene v. Barber*,

310 F. 3d 889, 895 (6th Cir. 2002); *Evans v. City of Chicago*, 2003 WL 22232963 (N.D. Ill 2003);

see also *Lekas v. Bailey*, 405 F. 3d 602, 614 (7th Cir. 2005) and the principle has been so long and

firmly established qualified immunity cannot be claimed. (*Duran v. City of Douglas, Arizona,* 904

F. 2d 1372 (9th Cir. 1989)

Thus, Defendant Dobson's Motion to Dismiss must demonstrate that there are no set of facts

which would demonstrate that the Plaintiff's conduct was constitutionally protected and that the

Plaintiff's conduct was a substantial or motivating factor in the Defendant's actions.  When an

officer attempts to punish a person for the exercise of First Amendment Rights by filing a criminal

charge against him there is a potential cause of action under both the Fourth and First Amendments

(Incorporated as against the States through the 14th Amendment)(See *Hartman v. Moore*, 126 S. Ct.

1695 (U.S. 2006), Abrams v. Walker, 307 F. 3d 650, 654 (7th Cir. 2002) (abrogated on other grounds

by *Spiegla v. Hull*, 371 F. 3d 928 (7th Cir. 2004).  Whether the hurdles imposed in a retaliatory

prosecution can be met is not a matter which should be determined at this stage of the pleadings.

In *Connell v. Town of Hudson*, 733 F. 3d 465 (D. N. H. 1990) a news photographer brought

an action against the Town of Hudson for violating his First Amendment Rights as an automobile

accident scene when officers instructed him not to take pictures.  No facts or circumstance which

would outweigh the Plaintiff's right to continue filming in this case had been proffered to the court.

Thus, no balancing is required of the rights and interests of the Plaintiffs versus the Police.

In *Iacobucci v. Boulter*, 193 F. 3d 14 (1st Cir. 1999) a journalist sued *inter alia* a police

officer arising out of interference with the videotaping of a meeting of the Penbroke Historic District Commission. The criminal charges in that case, as here, were dismissed and a *pro se* civil action was filed.  As in this case the complaint at issue might have been plead more clearly but no Defendant has claimed a lack of knowledge or notice as to the Plaintiffs claims in this case.  In analyzing the qualified immunity assertion the Court examined the underlying alleged defense and that the Plaintiff was exercising his First Amendment Rights in an appropriate fashion.  The Court rejected the claim of qualified immunity.

In *Berglund v. City of Maplewood, Minnesota*, 173 F. 2d 935 (Dist. Minn. 2001) similar issues were presented in the filming for broadcast of Plaintiffs television public access show entitled "Inside/Insight News Hour".  The Court specifically noted that during the confrontation the Plaintiff operated a video recorder and when he was arrested passed it to another who refused to voluntarily give up the video tape inside the video despite a demand that he do so.  That then resulted in police officers seizing and restraining the Plaintiff and confiscating the tape without a warrant on the alleged basis that it contained evidence of the commission of a crime.  The Court concluded that both the First and Fourth Amendments applied to the seizure at issue and that First Amendment materials are entitled to greater constitutional protection than material otherwise generally seized under the Fourth Amendment. (*Berglund v. City of Maplewood, Minnesota*, 173 F. Supp. 2d 935, 943 (Dist. Minn. 2001) The exigent circumstances exception acknowledged in Berglund has not been advanced by the Defendant herein nor is it factually supported.  While the ultimate decisions in Berglund is adverse to the Plaintiff's position in this case the analytical framework as applied to the eavesdropping statute as interpreted by the Illinois Supreme Court and the facts before this Court, which must be accepted as true, clearly support the maintenance of the Plaintiffs' claims and

the denial of the Motion to Dismiss.

It certainly cannot be reasonably questioned that the Plaintiffs' conduct was entitled to First Amendment Protection. (*See e.g. Smith v. City of Cumming,* 212 F. 3d 1332 (11th Cir. 2000) ; *Thompson v. City of Clio*, 765 F. Supp. 1066 (M.D. Ala. Div. 1991). The *Thompson* decision it is further relevant, in light of the implication raised by Defendant Dobson's grand jury statements in which she deems acceptable the taping of ones kids but not police officers, if the seizure, alteration, and charging of the Plaintiffs' in this case were unrelated to the content (videotaping of police officers) then the Plaintiffs' would have been in no worse position than members of the public filming the 4th of July parade with audio content or videotaping children in a park during a soccer game or otherwise. But we know they are not prosecuted. It was the videotaping of police that is the issue. These distinctions are important by virtue of the fact that it is a Motion to Dismiss which we are addressing. Recognition of First Amendment protection to the filming of police activities as a matter of public interest has also been acknowledged in *Porat v. Lincoln Towers Community Association*, 2005 WL 646093 (S.D.N.Y. 2005). The seizure and withholding of the camera and film and its subsequent alteration in order to interfere with filming and broadcast has been held to constitute an unlawful prior restraint. (*Channel 10 Inc. V. Gunnarson*, 337 F. Supp. 634 (Dist. Minn. 1972) (See also *Robinson v. Fetterman*, 378 F. Supp. 2d 534 (E. D. Penn. 2005) and citations therein at 541. Thus, the Fourth/Fourteenth Amendment seizure issues of the Plaintiff's videotape and camera the First Amendment Implications including those of prior restraint and retaliatory prosecution are directly placed before Defendant Dobson in this case and her claimed entitlement to absolute and qualified immunity has not been demonstrated.

Thus, the Plaintiff's respectfully requests that this Court deny Defendant Dobson's *Motion*

*to Dismiss* and that an answer be ordered to be filed by her and that this matter proceed with

discovery.

Respectfully submitted,

PATRICK THOMPSON, MARTEL MILLER
and VEYA, INC., Plaintiffs

**By: s/ Robert G. Kirchner**
Robert G. Kirchner Bar Number 6182070
Attorney for Plaintiffs
Robert G. Kirchner Law Office
100 Trade Centre Drive Suite 402
Champaign, IL 61820
Email: rgk-kirchnerlaw@sbcglobal.net

**By: s/ Ruth E. Wyman**
Ruth E. Wyman Bar Number: 6284294
One of the Attorneys for the Plaintiff
Robert G. Kirchner Law Office
100 Trade Centre Drive, Suite 402
Champaign, IL 61820
Phone: 217-355-5660
Facsimile: 217-355-5675
E-mail: rw-kirchnerlaw@sbcglobal.net

<u>CERTIFICATION OF COMPLIANCE WITH C.D. IL RULE 7.1(B)(4)B)(1)</u>
        I hereby certify that this memorandum complies with the type volume limitation and that
it contains 35,154 characters.

**By: s/ Robert G. Kirchner**
Robert G. Kirchner Bar Number 6182070
Attorney for Plaintiffs
Robert G. Kirchner Law Office
100 Trade Centre Drive Suite 402
Champaign, IL 61820
Email: rgk-kirchnerlaw@sbcglobal.net

**By: s/ Ruth E. Wyman**
Ruth E. Wyman Bar Number: 6284294
One of the Attorneys for the Plaintiff

Robert G. Kirchner Law Office
100 Trade Centre Drive, Suite 402
Champaign, IL 61820
Phone: 217-355-5660
Facsimile: 217-355-5675
E-mail: rw-kirchnerlaw@sbcglobal.net

CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of November, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Howard W. Small          hwslaw@shout.net

David E. Krchak          krchak@tmh-law.com

James D. Green           jim@tmh-law.com

Jerome P. Lyke           jeromelyke@yahoo.com


**By: s/ Robert G. Kirchner**
Robert G. Kirchner
One of the Attorneys for Plaintiffs
100 Trade Centre Drive, Suite 402
Champaign, IL 61820
Phone: (217) 355-5660
Facsimile: (217) 355-5675
E-mail: rgk-kirchnerlaw@sbcglobal.net

**By: s/ Ruth E. Wyman**
Ruth E. Wyman Bar Number: 6284294
One of the Attorneys for the Plaintiff
Robert G. Kirchner Law Office
100 Trade Centre Drive, Suite 402
Champaign, IL 61820
Phone: 217-355-5660
Facsimile: 217-355-5675
E-mail: rw-kirchnerlaw@sbcglobal.net