E-FILED
Thursday, 30 November, 2006 12:01:56 AM
Clerk, U.S. District Court, ILCD

IN THE CIRCUIT COURT OF CHAMPAIGN COUNTY, ILLINOIS

During the Month of SEPTEMBER A.D., 2004

THE PEOPLE OF THE STATE OF ILLINOIS

vs.

PATRICK D.THOMPSON

FILED
SIXTH JUDICIAL CIRCUIT
SEP 0 2 2004
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY ILLINOIS

INDICTMENT

EAVESDROPPING

A TRUE BILL

Foreman of the Grand Jury

WITNESSES

**David Griffet,IV, Champaign Police Department**

Bond fixed in the amount of

$____________________

Judge

PLAINTIFF'S
EXHIBIT
G

**STATE OF ILLINOIS** )
) ss.
**COUNTY OF CHAMPAIGN** )

Criminal No. 04-CF-1609
Count I

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT, CHAMPAIGN COUNTY, ILLINOIS, in the year of our Lord Two Thousand Four

FILED
SIXTH JUDICIAL CIRCUIT
SEP 02 2004
CHAMPAIGN COUNTY, ILLINOIS

THE GRAND JURORS, Chosen, selected and sworn in and for the County of Champaign, in the name and by the authority of the State of Illinois, upon their oaths do present:

THAT PATRICK D.THOMPSON

late of said County, on or about June –July,

in the year of our Lord Two Thousand Four at and within the said County of Champaign and State of Illinois aforesaid committed the offense of:

EAVESDROPPING-CLASS 1 FELONY,

In that the said defendant knowingly and intentionally used an eavesdropping device for the purpose of recording a conversation between Allen Wilson and David Griffet,IV, without the consent of Allen Wilson and David Griffet,IV, and that David Griffet,IV was a law enforcement officer engaged in the performance of official duties at the time of said recording, in violation of 720 Illinois Compiled Statutes, 5/14-2(a)(1)(A).

Contrary to the form of the Statute in such case made and provided and against the peace and dignity of the said People of the State of Illinois.

John C. Piland, State's Attorney

# CHAMPAIGN POLICE DEPARTMENT

## INCIDENT DETAIL

| | |
|---|---|
| Officer Number | 7914 |
| METCAD Event # | 042470141 |
| Shift | 3 |
| Case Number | CC0410399 |
| Occurred | 06/29-07/29/2004 23:00-07:00 |
| DOW | |
| Reported | 09/03/2004 04:58 |
| DOW | Friday |
| Time Dispatched | 00:00 |
| Time Arrived | 00:00 |
| Incident Adr. | CHAMPAIGN |
| Loc Type | 279. PARKING LOT - MUNICIPAL |
| GEO | 54508 |
| Related Incident Numbers | 704-9247 |

## OFFENSE

| Offense Crime Code/Description | CSA | Act | # Pr. | Force | Circ. | Weapon | Bias |
|---|---|---|---|---|---|---|---|
| 5000 EAVESDROPPING | | | 000 | NO | | 99 | 88 |

## SYNOPSIS

An officer's conversations were illegally recorded during a bar closing incident and a large gathering at a local business between the listed dates.

## VICTIM

| | |
|---|---|
| Name | GRIFFET IV, DAVID I |
| Address | CHAMPAIGN, IL 61820 |
| Telephone | (217)351-4545 |
| Emp Code | Y |
| Employer/School Name | CITY OF CHAMPAIGN |
| Emp. Address | CHAMPAIGN, IL 61820 |
| Emp .Tel. | (217)351-4545 |
| DOB | |
| Age (when occurred) | 37 |
| Race | W |
| Sex | M |
| Ht. | 508 |
| Wt. | 185 |
| Hair | BRO |
| Eye | BRO |
| SSN | 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 |
| DL# | |
| Injury Code | N |
| Victim Code | I |
| Hospitalized | NO |
| Treated by | |

| | |
|---|---|
| Name | WILSON, ALLEN D |
| Address | URBANA, IL 61801 |
| Telephone | Unknown |
| Emp Code | U |
| Employer/School Name | UNKNOWN |
| Emp. Address | |
| Emp .Tel. | Unknown |
| DOB | |
| Age (when occurred) | 36 |
| Race | B |
| Sex | M |
| Ht. | 510 |
| Wt. | 220 |
| Hair | BLK |
| Eye | BRO |
| SSN | 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 |
| DL# | |
| Injury Code | N |
| Victim Code | I |
| Hospitalized | NO |
| Treated by | |

## OTHER

| | |
|---|---|
| Name | ROGERS, RACHEL J |
| Address | URBANA, IL 61821 |
| Telephone | (217)344-3077 |
| Emp Code | U |
| Employer/School Name | UNKNOWN |
| Emp. Address | |
| Emp .Tel. | Unknown |
| DOB | |
| Age (when occurred) | 37 |
| Race | B |
| Sex | F |
| Ht. | 505 |
| Wt. | 250 |
| Hair | BLK |
| Eye | BRO |
| SSN | 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 |
| DL# | |
| Injury Code | N |
| Victim Code | I |
| Hospitalized | NO |
| Treated by | |

Reporting Officer: GRIFFET,DAVID

officer's initials ____ approved 8914

OTHER CONTD.

PLAINTIFF'S EXHIBIT H

## ARRESTEE/OFFENDER

| Name | Address | Telephone |
|---|---|---|
| MILLER, EDWARD MARTEL(offender) | CHAMPAIGN, IL 61820 | (217)356-8857 |

| Emp Code | Employer/School Name | Emp. Address | Emp .Tel. |
|---|---|---|---|
| U | UNKNOWN | | Unknown |

| DOB | Age (when occurred) | Race | Sex | Ht. | Wt. | Hair | Eye | SSN | DL# |
|---|---|---|---|---|---|---|---|---|---|
| | 42 | B | M | 511 | 235 | BLK | BRO | 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 | |

| Injury Code | Victim Code | Hospitalized | Treated by |
|---|---|---|---|
| N | I | NO | |

| Name | Address | Telephone |
|---|---|---|
| THOMPSON, PATRICK L(offender) | CHAMPAIGN, IL 61821 | Unknown |

| Emp Code | Employer/School Name | Emp. Address | Emp .Tel. |
|---|---|---|---|
| U | UNKNOWN | | Unknown |

| DOB | Age (when occurred) | Race | Sex | Ht. | Wt. | Hair | Eye | SSN | DL# |
|---|---|---|---|---|---|---|---|---|---|
| | 35 | B | M | 506 | 155 | BLK | BRO | 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 | |

| Injury Code | Victim Code | Hospitalized | Treated by |
|---|---|---|---|
| N | I | NO | |

## RELATION MATRIX

| Offense | Victim | Relation Code | Offender |
|---|---|---|---|
| 5000 | GRIFFET IV, DAVID I | RU | MILLER, EDWARD MARTEL |
| 5000 | GRIFFET IV, DAVID I | RU | THOMPSON, PATRICK L |
| 5000 | WILSON, ALLEN D | RU | THOMPSON, PATRICK L |

## NARRATIVE

Reporting Agent: Sergeant David Griffet

On Tuesday, August 31, 2004, after 2300 hours I met with Champaign County Assistant State's Attorney Elizabeth Dobson who gave me a VHS tape. Ms. Dobson told me that this tape is a copy of a tape that was submitted to the City of Urbana public television network for broadcasting on the local access channel. Ms. Dobson told me that she had obtained the copy with the issuance of a subpoena. Ms. Dobson asked me to review the tape and see what the tape shows.

Note: It should be noted that I was made aware of this tape by Urbana Police Lieutenant Mike Metzler about a week ago. I was at the Champaign County State's Attorney's Office when Lt. Metzler told me that he had reviewed this tape and had found that several officers had been illegally recorded.

Reporting Officer: GRIFFET,DAVID officer's initials approved [signature] NARRATIVE CONTD.

On Wednesday, September 4, 2004, I reviewed the tape and I observed video footage, which showed officers being illegally recorded while performing as police officers. Two (2) of the recorded incidents involved me. They were as follows:

Sometime between the first part of June, 2004 and July 2004, I was at the High Twelve Club monitoring the crowd at closing time. While watching the crowd, a fight broke out between two (2) females who had been separated by officers earlier in the evening. I helped separate the females and they were issued City NTA's for violating the City's fighting ordinance.

After this incident calmed down, I walked across the parking lot north of CPD (100 N. First Street) to watch another group of subjects when I came upon Martel. I saw a video camera in Martel's hands, however I did not know what type of footage he was recording or if he was recording at that time. I greeted Martel and I asked him if he had any problems with what had occurred. He said that he did not. He said that he was just out here, like I am. I told him that I worked for the citizens of Champaign and he said, "so do I."

I then went about my business and finished clearing the crowd.

The second incident on the video tape involving me occurred after June 29, 2004, at the Mac's located at 601 North Neil Street.

Note: It should be noted that during this time period CPD officers were routinely called to this business to remove large groups of people who had gathered in the parking lot after bar closing hours.

On this specific occasion Ms. Dobson was riding with me. When I arrived and observed a large crowd, Ms. Dobson offered to videotape the crowd's action from a safe distance. There was no voice recording, only video footage. As Ms. Dobson videotaped the crowd, she was soon videotaped by Patrick Thompson.



I then went to walk through the crowd and I came upon Allen Wilson, a person who I have had many police contacts with.

Note: It should be noted that in addition to being a Sergeant at the Champaign Police Department, I am also employed as a part-time Investigator for the Champaign County State's Attorneys Office in the Domestic Violence Unit.

During one (1) of these previous contacts Allen was a witness to a domestic situation (Violation of Order of Protection) involving Rachel Rogers. When I had spoken with Allen, I was in possession of a subpoena to be served on Rachel in the pending Violation of Order of Protection case, which Allen had witnessed. I told Allen that I had looked for Rachel at her home, but that I had not located her nor had she returned any of my requests to telephone me. Allen was intoxicated and very loud, however we had a conversation and he provided me a telephone number to contact Rachel. I thanked Allen for his time and he left the area.

On Wednesday, September 1, 2004, I returned this tape back to Ms. Dobson.

On Thursday, September 2, 2004, I appeared before the Champaign County Grand Jury to provide testimony regarding the August 7, 2004, incident. During this testimony I also testified to what I had heard and observed on the tape provided by Ms. Dobson. After testifying before the Grand Jury, Ms. Dobson asked me to complete a report pertaining to those incidents where I was illegally recorded.

Note: Attached is a copy of the VEYA letter submitted to Chief Finney on March 26, 2004, regarding the VEYA citizen watch program and what they would be doing in the community.

See 704-9247 for details regarding smilar incident.

| Copied By: | Entered/Filed By: |
|---|---|
| Miscellaneous/Leads #'s | |
| Signature of Reporting Officer / date | APPROVED (S / 9/4 / date 9/3/04 |

No secondary dissemmination without consent from Champaign Police Dept.

Reporting Officer: GRIFFET,DAVID

officer's initials ______ approved 9/914

IN THE CIRCUIT COURT OF CHAMPAIGN COUNTY, ILLINOIS
SIXTH JUDICIAL CIRCUIT

FILED
SIXTH JUDICIAL CIRCUIT
AUG 3 1 2004
Linda S. Frank
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS,
Plaintiff,

vs. NO: 04-CF-1482

E. MARTELL MILLER,
Defendant.

# SUBPOENA DUCES TECUM

TO: Chris Foster
Urbana Public Television

YOU ARE COMMANDED to appear to testify before the Grand Jury of Champaign County C/O Joel Fletcher, in County Board Meeting Room #1, in the Brooken Administration Building at 1776 East Washington, Urbana, Illinois on: September 2, 2004, at 9:00 o'clock AM.

YOU ARE COMMANDED ALSO to bring the following:

Please furnish any and all copies of videotapes concerning contacts by a citizen watch group ("COPWATCH") and police officers, including Sgt. David Griffet, Champaign Police Department and Sgt. Anthony Cobb, Urbana Police Department.

**SAID RECORDS SHOULD BE RETURNED TO: The Grand Jury of Champaign County, c/o Joel Fletcher in County Board Meeting Room #1 in the Brookens Administration Building at 1776 E. Washington, Urbana Illinois. FURTHER PLEASE MAKE NO DISCLOSURE OF THIS SUBPOENA OR ANY FURTHER RELATED SUBPOENAS. ANY SUCH DISCLOSURE COULD IMPEDE THE INVESTIGATION BEING CONDUCTED AND INTERFERE WITH THE ENFORCEMENT OF THE LAW**

In your possession or control.

**YOUR FAILURE TO APPEAR IN RESPONSE TO THIS SUBPOENA WILL SUBJECT YOU TO PUNISHMENT FOR CONTEMPT OF THIS COURT.**

(SEAL OF COURT)

WITNESS, August 31, 2004

Clerk of Court

Name JOHN C. PILAND/James E. Davis
Attorney for Champaign County
Address 101 E. Main Street, Courthouse
City Urbana, IL 61801
Telephone 217-384-3733

PLAINTIFF'S EXHIBIT
I

# CHAMPAIGN POLICE DEPARTMENT

## INCIDENT DETAIL

| | | | | |
|---|---|---|---|---|
| | Officer Number 7713 | METCAD Event # 042200580 | Shift 3 | Case Number CC0409247 |
| Occurred 08/07/2004 | 23:26 | DOW Saturday | | |
| Reported 08/07/2004 23:26 | DOW Saturday | Time Dispatched 23:26 | Time Arrived 23:26 | |
| Incident Adr. | | Loc Type 303. SIDEWALK | | GEO 54303 |

Related Officer Numbers
<7781>PYBURN,MICHAEL L --- <7708>CREEL,JEFFREY J --- <7713>CLINTON, JUSTUS
<7914>GRIFFET,DAVID I

## OFFENSE

| Offense Crime Code/Description | CSA | Act | # Pr. | Force | Circ. | Weapon | Bias |
|---|---|---|---|---|---|---|---|
| 5000 EAVESDROPPING | | | 000 | NO | 010 | 99 | 88 |

## SYNOPSIS

On the listed date and time, CPD Officers were video taped during a citizen contact pursuant to an IVC violation. After the citizen contact had concluded, a shift Sgt. was notified and contact was made with the male who was videotaping our activity. Sgt. Griffet spoke with the male, viewed a portion of the taped footage, and later seized the video camera for further investigation.

## ARRESTEE/OFFENDER

| | | |
|---|---|---|
| Name MILLER, E MARTEL(offender) | Address CHAMPAIGN, IL | Telephone (217)356-8857 |
| Emp Code U / Employer/School Name | Emp. Address CHAMPAIGN, IL | Emp .Tel. Unknown |

| DOB | Age (when occurred) | Race | Sex | Ht. | Wt. | Hair | Eye | SSN | DL# |
|---|---|---|---|---|---|---|---|---|---|
| | 43 | B | M | 511 | 235 | BLK | BRO | | |

| Injury Code | Victim Code | Hospitalized | Treated by |
|---|---|---|---|
| | | NO | |

## PROPERTY

| Description | Loss | Quantity | Measure | Property Code | Drug Code |
|---|---|---|---|---|---|
| Sony-Handycam-990x-Digital Zoom-Silver-8mm | Recv 6 | 1.000 | | 490 | |

| Serial Number | Value | Evidence? | Location | Disposition |
|---|---|---|---|---|
| 363412 | 500.00 | YES | | |

| Description | Loss | Quantity | Measure | Property Code | Drug Code |
|---|---|---|---|---|---|
| Hi8 Video Tape | Recv 6 | 1.000 | | 818 | |

| Serial Number | Value | Evidence? | Location | Disposition |
|---|---|---|---|---|
| | 5.00 | YES | | |

## NARRATIVE

Reporting Officer: CLINTON,JUSTUS

officer's initials JC approved ______

NARRATIVE CONT

PLAINTIFF'S EXHIBIT J

This report is to document the investigation of Eavesdropping on 080804.

Background:

Approximately 1 month ago, I had an informal meeting with Lt. Gallo, West District Supervisor, regarding the activities of the community based group "VEYA". During this meeting, I discussed the problems the VEYA group create during certain contacts with citizens. I explained to Lt. Gallo the following concerns:

-CPD Officers were called to the Bradley Ave. and McKinley St. area for a large fight involving 100 or more people. Upon arrival, Officers were met with a large and extremely unruly crowd. After numerous efforts, the crowd dispersed, and the threat of further violence in the area had been eliminated. Before Officers cleared the scene, 2 members of the VEYA group arrived and began videotaping miscellaneous people in the area including CPD Officers who were not speaking with citizens or taking any formal action. The crowd began to reform and multiple anti-police statements were made by members of the crowd. At times, young males were intentionally positioning themselves in front of the VEYA cameras displaying gang signs and yelling "fuck the police". At this particular moment, CPD Officers had not initiated contact with anyone and were remaining on scene to keep the peace.

I explained to Lt. Gallo that after the arrival of the 2 VEYA members, residents in the area appeared to be specifically negatively reacting toward the police in response to the presence of the VEYA group members.

-During times where VEYA group members were present during a police contact with a citizen(s) or during a call for service, I have experienced a VEYA group member position themselves approximately 5-8 yards directly in front of me when videotaping. While speaking with a citizen or monitoring a hostile crowd, a VEYA group member has obstructed my view by standing in front of

me and mirror/flank my movements in an effort to capture a better video camera angle.

I explained to Lt. Gallo that this activity significantly reduces my ability to monitor a hostile crowd and/or maintain my officer safety skills during a high stress situation and also places Officers at a significant tactical disadvantage.

-During times when the VEYA group is present, group members have illegally recorded the voice of CPD Officers when videotaping. VEYA group members will actively record the actions of CPD Officers and without modifying or adjusting their video cameras, begin to verbally interview citizens in the area. Because of this, it is reasonable to believe the video recording equipment the VEYA group uses, does not have the option to deactivate the camera's microphone, therefore, illegally recording Officer's voices.

After further discussion, Lt. Gallo advised the following:
-not take any enforcement action or effect an arrest for the offense of Eavesdropping at this time.

If I had reason to believe that my voice was being illegally recorded or if the actions/tactics used by VEYA group members were unsafe or obstructed my official performance, Lt. Gallo advised:
-to identify the VEYA group member employing the use of the video camera and generate an incident report to document their actions.

Incident Investigation:
At approximately 2312 hrs., Officer Pyburn initiated contact with a person riding a bike after an IVC violation was observed. I responded to the area of Bradley Ave. and Willis St. to assist Officer Pyburn.

Toward the end of Officer Pyburn's citizen stop, I noticed a

white colored full size van park directly across the street (to
the north).  A male exited the van, watched us for a brief
moment, and began to videotape us.

Due to the close distance between Officers and the male using the
video camera, I felt it was highly possible the male was
illegally recording the voices of Officer Pyburn, Creel, and
myself without our consent.

After Officer Pyburn completed the citizen stop James (the person
that Officer Pyburn had stopped) began to ride away.  As James
was riding away from the area, the male using the video camera
(later identified as Martel), summoned James' attention using a
hand gesture.  James then walked across the street and met with
Martel who activated the video camera and interviewed James on
the sidewalk.

I radioed Sgt. Griffet, North West District Supervisor for
08-08-04, and asked him to respond to my location.  Sgt. Griffet
agreed.

I then walked across the street and identified myself by rank and
last name.  I explained to Martel the following:
-Sgt. Griffet was currently responding to the area and would be
arriving shortly.
-I wanted to discuss his (Martel's) actions with Sgt. Griffet and
possibly ask him (Martel) further questions after I met with Sgt.
Griffet.
-I asked Martel if he would mind briefly waiting until I could
speak with Sgt. Griffet.  Martel agreed by stating "sure".

While waiting for Sgt. Griffet to arrive, I asked Martel for
identification which he provided.  I then completed an FI card to
obtain his information.

While completing the FI card, Martel raised his video camera in
an effort to continue to record my image and our conversation.  I


immediately stated to Martel "you do not have my consent to record my voice or conversation".  Martel dropped the video camera down to his side.

Officer Pyburn arrived and briefly spoke with Martel.

I asked Martel if his video camera had the option to turn off the recording microphone and Martel stated "no".

Martel then handed the video camera to James (who was still in the area observing our contact with Martel).  Martel then instructed James to videotape him.

James raised the camera to his face and turned it on.  Martel began to speak toward the camera introducing himself and describing the incident.

I told Martel that he did not have my consent to record my voice and what he was doing was a crime.  At the same time, Officer Pyburn told Martel that he was violating a law that is a felony offense.  James then stopped recording and turned the video camera off.

Sgt. Griffet arrived and spoke with Martel.  Sgt. Griffet viewed a small portion of the events recorded on Martel's video camera. Shortly after, Sgt. Griffet gave the video camera to me and instructed me to provide Martel with a receipt for his seized property.

I gave Martel a CPD Evidence Property Receipt listing as seized (1) Sony 8mm Handycam and (1) Hi8 Video Tape.

Shortly after, Patrick arrived in a blue colored 2 door sedan.  I remained on scene while Patrick yelled various unreasonable demands at Sgt. Griffet.  Sgt. Griffet attempted to provide an explanation for our actions, however, Patrick's behavior and comments were such that any attempt at communication by Sgt.

Griffet failed. (*Note- Prior to this incident, I have never met Patrick. See Sgt. Griffet's supplemental report.)

All officers then cleared the area.

While back at CPD, I viewed the seized videotape and noted 2 recorded events as follows:

1-A recorded traffic stop initiated by a University of Illinois Police Officer in the east entrance of the Garcia's Pizza Restaurant on Green St.
-During this traffic stop, a conversation between the U of I Officer and the suspect motorist can clearly be overheard. At no time did the person using the videotape ask for the consent of the U of I Officer or the suspect motorist.

2-A short portion of the end of Officer Pyburn's citizen stop that occurred today.
-Initially, it is difficult to hear the dialogue between CPD Officers and James due to the ambient noise and passing traffic.
-After the contact involving James had ended, my voice and Officer Pyburn's voice can be overheard. At no time did Officer Pyburn or myself give Martel our consent to record our voice.

I then secured the seized property into evidence locker #29.

See Sgt. Griffet and Officer Pyburn's narratives for full details.

I had no further involvement with this incident.

ɔpied By: | Entered/Filed By:

scellar

ɲnature of Reportir | date 080804 | APPROVED (Supervisor) | date

No seconuary dissemmination without consent from Champaign Police Dept.

ɔrting Offic.

officer's initials | approved

# CHAMPAIGN POLICE DEPARTMENT
## SUPPLEMENTAL REPORT

Page 1 of 2

SUPPLEMENTAL DETAIL

| Case Number CC0409247 | Officer Number 7914 | Date Entered 09/03/2004 | Date/Time of Orig. Rpt. 08/07/2004 23:26 |
|---|---|---|---|
| Incident Address 928 W BRADLEY AVENUE X STR (926 W BRADLEY/1200 CHAMPAIGN | | | Title of Report: Eavesdropping |

NARRATIVE

Reporting Agent: Sergeant David Griffet

This is a supplemental report.

On August 7, 2004, just after 2330 hours I was asked to respond to the Champaign, Champaign County, Illinois. Upon arrival I was told that officers suspected that Martel Miller had been recording their conversations with his video camera.

I spoke with Martel and explained what I had been told. I asked him if I could view the documented footage and he gave me the camera so I could review it. While reviewing a short section of the tape I could hear Officer Clinton's voice on the tape.

I then went to my squad car and I spoke briefly with Champaign County Assistant State's Attorney Elizabeth Dobson who had been riding along with me. I told Ms. Dobson what I had found. I told her that I wanted to seize the tape since it was potential evidence of a crime and the recorder since it was used to make the recording. Ms. Dobson told me that I had the authority to do this without a warrant.

I then met with Martel and I told him that I would be seizing the tape and the recorder. He then called Patrick Thompson on his cellular telephone and Patrick soon arrived and yelled at me.

I later reviewed the footage on the tape at CPD and I found a traffic stop involving a University of Illinois police officer. After this discovery I contacted Sgt. Frederick at the University of Illinois Police Department and Sgt. Frederick told me that he would have his officer complete a report.

Reporting Officer: GRIFFET,DAVID officer's initials ____ approved 7914 NARRATIVE CONTD.

PLAINTIFF'S
EXHIBIT
K

CC0409247

NARRATIVE CONTD.

See previous reports for further details.

Copied By:

Entered/Filed By:

Miscellaneous/Leads #'s

Signature of Reporting Officer date

APPROVED date 9/3/04

No secondary dissemination without consent from Champaign Police Dept.

Reporting Officer: GRIFFET,DAVID

officer's initials ______ approved 9/4

# CHAMPAIGN POLICE DEPARTMENT

## INCIDENT DETAIL

| | | | | |
|---|---|---|---|---|
| Occurred 08/07/2004 23:26 | Officer Number 7713 | METCAD Event # 042200580 / DOW Saturday | Shift 3 | Case Number CC0409247 |
| Reported 08/07/2004 23:26 | DOW Saturday | Time Dispatched 23:26 | Time Arrived 23:26 | |
| Incident Adr. CHAMPAIGN | | Loc Type 303. SIDEWALK | | GEO 54303 |

Related Officer Numbers

<7781>PYBURN,MICHAEL L --- <7708>CREEL,JEFFREY J --- <7713>CLINTON, JUSTUS

<7914>GRIFFET,DAVID I

## OFFENSE

| Offense Crime Code/Description | CSA | Act | # Pr. | Force | Circ. | Weapon | Bias |
|---|---|---|---|---|---|---|---|
| 5000 EAVESDROPPING | | | 000 | NO | 010 | 99 | 88 |

## SYNOPSIS

On the listed date and time, CPD Officers were video taped during a citizen contact pursuant to an IVC violation. After the citizen contact had concluded, a shift Sgt. was notified and contact was made with the male who was videotaping our activity. Sgt. Griffet spoke with the male, viewed a portion of the taped footage, and later seized the video camera for further investigation.

## ARRESTEE/OFFENDER

| Name | Address | Telephone |
|---|---|---|
| MILLER, E MARTEL(offender) | CHAMPAIGN, IL | (217)356-8857 |

| Emp Code | Employer/School Name | Emp. Address | Emp .Tel. |
|---|---|---|---|
| U | | CHAMPAIGN, IL | Unknown |

| DOB | Age (when occurred) | Race | Sex | Ht. | Wt. | Hair | Eye | SSN | DL# |
|---|---|---|---|---|---|---|---|---|---|
| | 43 | B | M | 511 | 235 | BLK | BRO | | |

| Injury Code | Victim Code | Hospitalized | Treated by |
|---|---|---|---|
| | | NO | |

## PROPERTY

| Description | Loss | Quantity | Measure | Property Code | Drug Code |
|---|---|---|---|---|---|
| Sony-Handycam-990x-Digital Zoom-Silver-8mm | Recv 6 | 1.000 | | 490 | |

| Serial Number | Value | Evidence? | Location | Disposition |
|---|---|---|---|---|
| 363412 | 500.00 | YES | | |

| Description | Loss | Quantity | Measure | Property Code | Drug Code |
|---|---|---|---|---|---|
| Hi8 Video Tape | Recv 6 | 1.000 | | 818 | |

| Serial Number | Value | Evidence? | Location | Disposition |
|---|---|---|---|---|
| | 5.00 | YES | | |

## NARRATIVE

Reporting Officer: CLINTON,JUSTUS

officer's initials JC approved ____________

NARRATIVE CONT

PLAINTIFF'S EXHIBIT L

This report is to document the investigation of Eavesdropping on 080804.

Background:

Approximately 1 month ago, I had an informal meeting with Lt. Gallo, West District Supervisor, regarding the activities of the community based group "VEYA". During this meeting, I discussed the problems the VEYA group create during certain contacts with citizens. I explained to Lt. Gallo the following concerns:

-CPD Officers were called to the Bradley Ave. and McKinley St. area for a large fight involving 100 or more people. Upon arrival, Officers were met with a large and extremely unruly crowd. After numerous efforts, the crowd dispersed, and the threat of further violence in the area had been eliminated. Before Officers cleared the scene, 2 members of the VEYA group arrived and began videotaping miscellaneous people in the area including CPD Officers who were not speaking with citizens or taking any formal action. The crowd began to reform and multiple anti-police statements were made by members of the crowd. At times, young males were intentionally positioning themselves in front of the VEYA cameras displaying gang signs and yelling "fuck the police". At this particular moment, CPD Officers had not initiated contact with anyone and were remaining on scene to keep the peace.

I explained to Lt. Gallo that after the arrival of the 2 VEYA members, residents in the area appeared to be specifically negatively reacting toward the police in response to the presence of the VEYA group members.

-During times where VEYA group members were present during a police contact with a citizen(s) or during a call for service, I have experienced a VEYA group member position themselves approximately 5-8 yards directly in front of me when videotaping. While speaking with a citizen or monitoring a hostile crowd, a VEYA group member has obstructed my view by standing in front of



me and mirror/flank my movements in an effort to capture a better video camera angle.

I explained to Lt. Gallo that this activity significantly reduces my ability to monitor a hostile crowd and/or maintain my officer safety skills during a high stress situation and also places Officers at a significant tactical disadvantage.

-During times when the VEYA group is present, group members have illegally recorded the voice of CPD Officers when videotaping. VEYA group members will actively record the actions of CPD Officers and without modifying or adjusting their video cameras, begin to verbally interview citizens in the area. Because of this, it is reasonable to believe the video recording equipment the VEYA group uses, does not have the option to deactivate the camera's microphone, therefore, illegally recording Officer's voices.

After further discussion, Lt. Gallo advised the following:
-not take any enforcement action or effect an arrest for the offense of Eavesdropping at this time.

If I had reason to believe that my voice was being illegally recorded or if the actions/tactics used by VEYA group members were unsafe or obstructed my official performance, Lt. Gallo advised:
-to identify the VEYA group member employing the use of the video camera and generate an incident report to document their actions.

Incident Investigation:
At approximately 2312 hrs., Officer Pyburn initiated contact with a person riding a bike after an IVC violation was observed. I responded to the area of Bradley Ave. and Willis St. to assist Officer Pyburn.

Toward the end of Officer Pyburn's citizen stop, I noticed a

white colored full size van park directly across the street (to the north). A male exited the van, watched us for a brief moment, and began to videotape us.

Due to the close distance between Officers and the male using the video camera, I felt it was highly possible the male was illegally recording the voices of Officer Pyburn, Creel, and myself without our consent.

After Officer Pyburn completed the citizen stop James (the person that Officer Pyburn had stopped) began to ride away. As James was riding away from the area, the male using the video camera (later identified as Martel), summoned James' attention using a hand gesture. James then walked across the street and met with Martel who activated the video camera and interviewed James on the sidewalk.

I radioed Sgt. Griffet, North West District Supervisor for 08-08-04, and asked him to respond to my location. Sgt. Griffet agreed.

I then walked across the street and identified myself by rank and last name. I explained to Martel the following:
-Sgt. Griffet was currently responding to the area and would be arriving shortly.
-I wanted to discuss his (Martel's) actions with Sgt. Griffet and possibly ask him (Martel) further questions after I met with Sgt. Griffet.
-I asked Martel if he would mind briefly waiting until I could speak with Sgt. Griffet. Martel agreed by stating "sure".

While waiting for Sgt. Griffet to arrive, I asked Martel for identification which he provided. I then completed an FI card to obtain his information.

While completing the FI card, Martel raised his video camera in an effort to continue to record my image and our conversation. I

immediately stated to Martel "you do not have my consent to record my voice or conversation". Martel dropped the video camera down to his side.

Officer Pyburn arrived and briefly spoke with Martel.

I asked Martel if his video camera had the option to turn off the recording microphone and Martel stated "no".

Martel then handed the video camera to James (who was still in the area observing our contact with Martel). Martel then instructed James to videotape him.

James raised the camera to his face and turned it on. Martel began to speak toward the camera introducing himself and describing the incident.

I told Martel that he did not have my consent to record my voice and what he was doing was a crime. At the same time, Officer Pyburn told Martel that he was violating a law that is a felony offense. James then stopped recording and turned the video camera off.

Sgt. Griffet arrived and spoke with Martel. Sgt. Griffet viewed a small portion of the events recorded on Martel's video camera. Shortly after, Sgt. Griffet gave the video camera to me and instructed me to provide Martel with a receipt for his seized property.

I gave Martel a CPD Evidence Property Receipt listing as seized (1) Sony 8mm Handycam and (1) Hi8 Video Tape.

Shortly after, Patrick arrived in a blue colored 2 door sedan. I remained on scene while Patrick yelled various unreasonable demands at Sgt. Griffet. Sgt. Griffet attempted to provide an explanation for our actions, however, Patrick's behavior and comments were such that any attempt at communication by Sgt.

Griffet failed. (*Note- Prior to this incident, I have never met Patrick. See Sgt. Griffet's supplemental report.)

All officers then cleared the area.

While back at CPD, I viewed the seized videotape and noted 2 recorded events as follows:

1-A recorded traffic stop initiated by a University of Illinois Police Officer in the east entrance of the Garcia's Pizza Restaurant on Green St.
-During this traffic stop, a conversation between the U of I Officer and the suspect motorist can clearly be overheard. At no time did the person using the videotape ask for the consent of the U of I Officer or the suspect motorist.

2-A short portion of the end of Officer Pyburn's citizen stop that occurred today.
-Initially, it is difficult to hear the dialogue between CPD Officers and James due to the ambient noise and passing traffic.
-After the contact involving James had ended, my voice and Officer Pyburn's voice can be overheard. At no time did Officer Pyburn or myself give Martel our consent to record our voice.

I then secured the seized property into evidence locker #29.

See Sgt. Griffet and Officer Pyburn's narratives for full details.

I had no further involvement with this incident.

Copied By:

Entered/Filed By:

Miscellaneous/Leads #'s

Signature of Reporting

date 080804

APPROVED (Supervisor) date

No secondary dissemmination without consent from Champaign Police Dept.

Reporting Officer: CLINTON,JUSTUS

officer's initials

approved

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MARTEL MILLER and PATRICK THOMPSON, VEYA, INC., )
)
Plaintiffs, )
)
v. ) 05-2142
) JURY DEMAND
CITY OF CHAMPAIGN, CITY MANAGER STEVE CARTER, )
CITY ATTORNEY FRED STAVINS, CHIEF OF POLICE R.T. )
FINNEY, DEPUTY CHIEF JOHN MURPHY, DEPUTY CHIEF )
TROY DANIELS, LT. JOHN SWENSON, SGT. DAVID )
GRIFFET, OFFICER JUSTUS CLINTON, OFFICER MICHAEL )
PYBURN, and UNKNOWN OFFICER, All in Their Individual )
and Official Capacity, CHAMPAIGN COUNTY, STATE'S )
ATTORNEY JOHN PILAND, ASST. STATES ATTORNEY )
ELIZABETH DOBSON, All in Their Individual and Official )
Capacity, CITY OF URBANA, ASSISTANCE CHIEF OF )
POLICE MIKE BILY, All in Their Individual and Official )
Capacity, )
)
Defendants. )

AFFIDAVIT OF PATRICK THOMPSON

I, PATRICK THOMPSON, under penalty of perjury under 28 U.S.C. §1746, state that the following is true and accurate; and if called upon to testify, my testimony would be as follows:

1. I am one of the named Plaintiffs in the above-referenced lawsuit.
2. I am a President and co-founder of VEYA Foundation, which stands for Visionaries Educating Youths and Adults.



3.    VEYA was incorporated on May 3, 2004.

4.    On or about March 26, 2004, Martel Miller, one of the named Plaintiffs in the above-referenced cases (hereinafter 'Martel') and I mailed correspondence addressed to Champaign Police Chief Finney explaining that our organization would be monitoring the police.

5.    The letter includes the following statement: "If you have any questions or concerns, you may contact us at: veya@lists.cu.groogroo.com"

6.    I have access to the email listed above, checked it regularly, and never received any comments from any officers, the City, or anyone else raising any concerns or questions about the videotaping.

7.    No one ever contacted me after this letter was sent about any concerns they had about monitoring the police or our project.

8.    The correspondence mailed to Police Chief Finney was signed by Martel Miller, and a copy of that correspondence was mailed on or about March 26, 2004 to City of Champaign Mayor Gerald Schweighart and City of Champaign City Manager Steve Carter.

9.    A true and exact copy of that correspondence is attached as EXHIBIT A.

10.    On or about the first of May, 2004, Martel Miller and I held a public forum at which we discussed our project to monitor police and citizen interactions. Many officers and other community members were present at the forum. I believe I told the audience that we were going to be taping interactions between the police and citizens, and putting it on UPTV. I specifically remember officer Griffet in attendance at the forum.

11.    The forum that we held on our program to monitor police and citizen interactions was broadcast on UPTV from May through June, 2004.

12.    At no time did any of the officers, including those present at the forum, or any other public official present at the forum, voice any displeasure or objection to our intent to tape the police interactions with local citizens until our tape and camcorder were confiscated on August 7, 2004.

13.    Prior to beginning our videotaping, Martel and I met with Mayor Schweighart. He asked us what the letter that we sent him (on March 26, 2004) was about, and Martel and I told him that we were going to be taping the police interactions with citizens. Mayor Schweighart said he didn't have any problem with us doing that.

14.    Between March 26, 2004 and May 1, 2004, I and Martel Miller met with Mayor Schweighart and spoke with him regarding our intention to begin taping police and citizen interactions and Mayor Schweighart didn't make any statement that he did not want the police being taped.

15.    I had several interactions with Champaign, Urbana, and University police officers between Memorial Day Weekend, 2004 and August 7, 2004 while I was taping the

officers' interactions with local citizens.

16. Between Memorial Day Weekend, 2004 and August 7, 2004, the police officers saw me taping them and talked with me while I was taping.

17. The officers with whom I spoke while I was taping between Memorial Day Weekend, 2004 and August 7, 2004 included Champaign Police Officer Griffet, a named Defendant in the above-referenced lawsuit, and Urbana Police Officer Anthony Cobb.

18. I never incited any individuals while I was taping or watching Martel Miller tape any interactions between officers and citizens.

19. There was never more than one person taping for VEYA at a time. Other than Nikki Lamers taping a scene on the University of Illinois campus, all of the rest of the taping for VEYA was conducted by either me or Martel Miller.

20. I made a conscious effort to not interfere with any police/citizen action by waiting to speak with any citizens until after the police/citizen interaction had ended.

21. Throughout our taping of police interactions with local citizens, we conducted ourselves out in the open where everyone could see us and could see what we were doing. We also took precaution to not interfere with any of the officers' interactions with the citizens by waiting to interview citizens, and even talk with officers, until after the officers had concluded their interactions with the citizens.

22. Throughout our interactions with the police – from our letter to Chief Finney, our conversation with the Mayor, our conversations with various police officers including Officer Griffet, and the lack of any communication from any officer noting any dissent made me believe that I had permission to video and audio record the officers' interactions, including Officer Griffet's.

23. I put together and have viewed the entire videotape submitted to Urbana Public Television on August 23, 2004 and am familiar with its contents.

24. The video tape created by Martel and I and submitted to Urbana Public Television for viewing on the public access channel (hereinafter 'UPTV tape') included taping between Memorial Day Weekend, 2004 and August 7, 2004.

25. The UPTV tape includes Officer Griffet telling Martel he doesn't mind Martel taping him.

26. The UPTV tape also includes footage of Griffet waving at the camera and walking toward Martel, and telling Martel that he was curious about the videotaping and that he did not feel that they were doing anything improper.

27. The UPTV tape shows Officer Griffet asking Martel about what he was doing and referring to the videotaping that Martel was conducting at the time and Officer Griffet stating to Martel that he had no problem with the taping that was taking place.

28. No officer ever told me not to tape them.

29. At the community forum we held in early May, 2004, which was attended by several Champaign Police Department officers as well as community members, Martel Miller

and I discussed our intention to monitor the police and begin taping the interactions and that the taping would be broadcast on UPTV (Urbana Public Television public access channel).

30. On about August 22, 2004, Martel and I finished editing the CitizenWatch videotape for viewing on UPTV.

31. The video included footage shot by Martel and I between May 2004 and Aug 2004. The video included club scenes at the American Legion (Patrick taped this part), traffic stops, Campus getting out, interview of African American after he was stopped by police for allegedly shoplifting (which he hadn't done); more than five police cars; campus when the bars let out (no police- also there was a lot of jay walking, property destruction); the fair ground incident at the Champaign County Fair; Urbana Police Officer Cobb saying that the police tape people, so if the cops charge Martel and Patrick, they'd have to charge the officers with the same offense, and also stating that the law of not permitting audio taping is not enforced.

32. During the filming of the fair grounds, another Urbana Officer, whose name I do not know, stated that I had the right to videotape the youths, who were expressing displeasure with me videotaping.

33. Neither the officer nor the individual being stopped and questioned by the police can be heard on the UPTV video in which two traffic stops are shown including the traffic stop in front of Mac's at 601 N. Neil Street in Champaign, Illinois.

34. Until August 7th, when Griffet ordered that our camcorder and videotape be confiscated, I was not aware that any of the officers or the administration did not approve of or consent to our taping of the officers.

35. In the late evening hours of August 7, 2004, I received a phone call from Martel Miller, one of the named Plaintiffs in the above-referenced lawsuit.

36. Martel indicated to me that he was speaking with police officers who were trying to confiscate our hand-held video recorder and the videotape inside the recorder.

37. I arrived at the location where Martel Miller and several other officers, including Officer Griffet of the Champaign Police Department were standing.

38. When Officer Griffet told Martel and I that he was going to seize the camcorder and video, I objected to the seizure of our property.

39. I was upset that the police were going to take our video recorder and video tape and I asked if the officers had a warrant.

40. The officers responded that they did not have a warrant to seize the video recorder or the video tape.

41. Officer Griffet informed us that Assistant State's Attorney Dobson, who he said was in the police car several feet away from where we were standing, had informed him that he had the right to seize both our camera and the videotape inside the camera, which he then

instructed other officers to do.

42. I never swore or yelled at Officer Griffet on August 7, 2004.

43. Until the video tape and hand-held recorder was confiscated on August 7, 2004, I had never been warned or told by any officer that they objected to us taping them.

44. On June 29, 2004, at approximately 2 am, I was standing in the parking lot of Mac's, and videotaped a traffic stop that involved three officers. I was more than 100 feet away from the traffic stop while I was taping the stop. As I was taping the traffic stop, a crowd began to form in front of Mac's. Within thirty seconds of finishing my filming of the traffic stop, I turned the camera toward the crowd forming at Mac's. I began taping the crowd and had conversations while I was taping, with some of the people in the crowd. While I was taping, I also saw and videotaped Elizabeth Dobson videotaping the same scene of events that I was taping. I do not know if she was recording any voices because I have not seen the videotape she made. During my taping, I noticed Officer Griffet yelling at a man whose name I later learned to be Allen Wilson. They did not appear to be having a private conversation, since Griffet was yelling and swearing at him, and Mr. Wilson was yelling back. At one point in their conversation, you can hear Allen referring to Griffet having 'his boys', referring to the officers), look like they were ready to jump him (Mr. Wilson). Two other officers were present and in the crowd that I was taping. Despite my presence with my camcorder, none of the officers, including Officer Griffet, nor Assistant State's Attorney Dobson, asked me to stop taping them or the scene.

45. I later interviewed Allen Wilson on videotape about the incident on June 29th at Mac's. He never objected to being filmed.

46. In addition to taping Griffet on June 29, 2004 at Mac's, I have videotaped him on two other occasions since June 29, 2004. Despite these three times that I videotaped him and he was aware of my taping him, he never approached me or otherwise contacted me to request that I not audio or video tape him or to even suggest any displeasure at my taping of him and his interactions with other people.

47. I reviewed Defendant Clinton's police report and have absolutely no idea what incident he is discussing on Page 2 of 6. (See EXHIBIT L, attached.)

48. On Monday August 9, 2004, I was with Martel Miller when he received a call on his cell phone.

49. Martel told me that the call was from the Champaign police and that they wanted Martel to come into the station that day.

50. I called Attorney Bruce Ratcliffe and told him about the phone call from the Champaign Police that Martel had received.

51. Attorney Ratcliffe met Martel and I at the Champaign Police Department that day.

52. At the Champaign Police Department, Attorney Ratcliffe and I went into the conference

room and met with Lieutenant Yohnka and another officer and discussed the videotaping that had taken place.

53. On August 23, 2004, I attended the court hearing in Champaign County Court where Martel was charged with three counts of eavesdropping.

54. The following day, August 24, 2004, I was arrested on other issues that allegedly occurred that same day and charged in Champaign County case 04-CF-1609.

55. On September 2, 2004, I was charged by the Champaign County State's Attorney's office with Eavesdropping. (A copy of the Indictment is attached hereto as EXHIBIT G)

56. On September 8, 2004 I appeared in Court and entered a plea of not guilty.

57. On September 8, 2004, my appointed attorney requested that I be released on my own recognizance, but that request was denied.

58. On December 1, 2004, the first day of newly-elected State's Attorney Julia Rietz term, the State moved to dismiss the charge against me and the cause was ordered dismissed and stricken.

59. I believe that the charges were filed against me at least in part in retaliation for my filming Dobson on June 29, 2004, when she was filming the same crowd that I was filming and for exposing Dobson's ride alongs with Griffet. According to news articles, Dobson stopped doing 'ridealongs' after Martel and I were charged with eavesdropping.

60. I have been harassed by Champaign police officers on numerous occasions.

61. On approximately October 9, 2004, I was stopped in front of the Illini Union, 1401 W. Green Street, Urbana, Illinois around 1:30 am - 2 am.

62. The officer that pulled me over told me that he pulled me over because he though I was not wearing a seatbelt.

63. I was driving an older model vehicle that has the seat low and back.

64. At that late hour and in the vehicle I was driving at the time, there was no way that the officer could see from his squad car whether or not my seatbelt was on.

65. I witnessed the officer follow me from Fourth Street and Green Street in Champaign several blocks to the Illini Union before he put his lights on to pull me over.

66. I asked the officer asked why he pulled me over and the officer responded that he pulled me over because I was not wearing my seat belt.

67. When I showed the officer that I was wearing my seat belt and so was not violating the seat belt law, he stated that my seatbelt was not properly on and this is why he was pulling me over.

68. An additional squad car then came to the scene.

69. I showed the officer that I had an permit that allowed me to drive.

70. The officer then returned to his squad car and 'ran' my name and came back and told me

that I was under arrest for driving on a revoked license.

71. I responded that he was pulling me over because of my race, to which he responded by saying to me that I was a drug dealer.

72. I was taken to jail and posted $100 to bail out of jail.

73. I filed a complaint with the Champaign Police Department for the officer's treatment of me, but the response I received back was that the police had done nothing wrong.

74. The State's attorney later dismissed the charge against me for driving while revoked.

75. I was harassed again by the Champaign police on or about December 27, 2003 around midnight when I was alone in the parking lot next to the High Dive on Main Street in downtown Champaign.

76. My car was stopped as I was waiting for other cars to move in the parking lot.

77. I had my windows rolled up, as it was cold.

78. While I was drinking tea out of a black cup as I sat waiting in my car, Officer Griffet walked up to my car. I rolled down the window because I saw officer Griffet wanted to speak with me. He asked me if the cup I was drinking from was a that was a 40 oz mug.

79. I showed him the cup of tea.

80. Officer Griffet didn't ask me my name, nor request any identification from me and I didn't offer him my name.

81. Shortly after my interaction with Officer Griffet, I pulled out of parking lot, turned right (west) onto Main Street. When I arrived near the intersection of Neil Street where Main Street turns into Church, I pulled into the parking lot at Church and Neil. At that point, I noticed that I was being followed by Champaign Police officers. I proceeded on and drove on Hill Street, then turned left on Neil Street and east on Main Street. At that point, another officer pulled in behind me (the other officer who had been following me had stopped following me). As I arrived near the High Dive on Main Street, the officer that had been following me turned on his over-head lights and pulled me over in front of old train station. The officer, who I soon found out was Officer Lack) pulled in behind me, exited his squad car and walked up to my car. The officer flashed his light in my face and around car. The officer asked me for my driver's license, insurance and registration. I asked the officer what I was being pulled over for. The officer responded to me by saying something like there was a problem with my rear license plate. I told him the rear license plate light was on. The officer disagreed and issued me a 'warning'. After I received the warning ticket, Officer Lack left the scene and I drove away as well.

82. I filed a complaint regarding the officers' treatment of me with the Champaign Police Department. A copy of that complaint was filed as #8-3 in this case.

83. The response I received acknowledged that there was no problem with my rear license plate light, but denied that the officers did anything wrong. A copy of the correspondence from the City of Champaign regarding my complaints dated February 5, 2004, was filed as #8-3 in this case.

84. I feel that the officers' following me and pulling me over for alleged traffic violations that I did not commit is racial harassment because of my race, African American, and color, black.

85. Because several officers have been a part of this harassment of me, I believe that these incidents were instituted by the Champaign police department as part of the department's racial profiling and in an attempt to harass him because of his race, African American, and his color, black.

FURTHER AFFIANT SAYETH NOT.

/s

Patrick Thompson

OFFICIAL SEAL
RUTH E. WYMAN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10/04/08

Champaign County )

State of Illinois )

Subscribed and Sworn to before me this 29 day of November, 2006.

/s Ruth Wyman

Notary Public

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MARTEL MILLER and PATRICK THOMPSON, VEYA, INC., )
)
Plaintiffs, )
)
v. ) 05-2142
) JURY DEMAND
CITY OF CHAMPAIGN, CITY MANAGER STEVE CARTER, )
CITY ATTORNEY FRED STAVINS, CHIEF OF POLICE R.T. )
FINNEY, DEPUTY CHIEF JOHN MURPHY, DEPUTY CHIEF )
TROY DANIELS, LT. JOHN SWENSON, SGT. DAVID )
GRIFFET, OFFICER JUSTUS CLINTON, OFFICER MICHAEL )
PYBURN, and UNKNOWN OFFICER, All in Their Individual )
and Official Capacity, CHAMPAIGN COUNTY, STATE'S )
ATTORNEY JOHN PILAND, ASST. STATES ATTORNEY )
ELIZABETH DOBSON, All in Their Individual and Official )
Capacity, CITY OF URBANA, ASSISTANCE CHIEF OF )
POLICE MIKE BILY, All in Their Individual and Official )
Capacity, )
)
Defendants. )

**AFFIDAVIT OF MARTEL MILLER**

I, MARTEL MILLER, under penalty of perjury under 28 U.S.C. §1746, state that the following is true and accurate; and if called upon to testify, my testimony would be as follows:

1. I am one of the named Plaintiffs in the above-referenced lawsuit.
2. I am a co-founder of VEYA Foundation, which stands for Visionaries Educating Youths and Adults.
3. VEYA was incorporated on May 3, 2004.
4. On or about March 26, 2004, Patrick Thompson, one of the named Plaintiffs in the above-referenced cases (hereinafter 'Patrick) and I mailed correspondence addressed to Champaign Police Chief Finney explaining that our organization would be monitoring



the police.

5. The letter includes the following statement: "If you have any questions or concerns, you may contact us at: veya@lists.cu.groogroo.com" I have access to this email address and was never contacted by anyone listing any concerns or objections to being taped.

6. No one ever contacted me after this letter was sent about any concerns they had about monitoring the police or our project.

7. The correspondence mailed to Police Chief Finney was signed by me, and a copy of that correspondence was mailed on or about March 26, 2004 to City of Champaign Mayor Gerald Schweighart and City of Champaign City Manager Steve Carter.

8. A true and exact copy of that correspondence is attached as EXHIBIT A.

9. Between March 26, 2004 and May 1, 2004, I and Patrick Thompson met with Mayor Schweighart and spoke with him regarding our intention to begin taping police and citizen interactions. Mayor Schweighart said he did not have any objection to us taping police and citizen interactions.


10. At the community forum we held in early May, 2004, which was attended by several Champaign Police Department officers as well as community members, Patrick and I discussed our intention to monitor the police. Several Champaign Police Department officers were present, including officer Griffet.

11. Between May and June 2004, a video of our forum ran on UPTV.

12. Before taping of the police and citizen interactions began, Patrick and I met with Mayor Schweighart , who asked us what our letter was about. We told him that we were going t to videotape police and citizen interactions, and he responded that he had no problem with that.

13. Based on our correspondence to Chief Finney on March 26, 2004, our interactions with the officers being out in public taping the officers interactions, and the officers acknowledgment of us taping them, including Officer Clinton telling me that if any of the officers saw us taping, they were instructed to talk with us (See Exhibit J).

14. On about August 22, 2004, Patrick and I finished editing the CitizenWatch videotape for viewing on UPTV.

15. I and Patrick Thompson put together and I have viewed the entire videotape submitted to Urbana Public Television on August 23, 2004 and am familiar with its contents.

16. The video tape created by Patrick Thompson and I and submitted to Urbana Public Television for viewing on the public access channel (hereinafter 'UPTV tape') included taping between Memorial Day weekend, 2004 and August 7, 2004.

17. The UPTV tape includes Officer Griffet telling me he doesn't mind me taping him.

18. The UPTV tape also includes footage of Officer Griffet waving at the camera and walking toward me, and telling me that he was curious about the videotaping and that he did not feel that we were doing anything improper.

19. The UPTV tape shows Officer Griffet asking Martel about what he was doing and referring to the videotaping that Martel was conducting at the time and Officer Griffet

stating to Martel that he had no problem with the taping that was taking place.

20. I turned the video in to Chris Foster at UPTV on 8/23/04.

21. When I returned to pick up the tape from UPTV on 8/24/04, Christ Foster told me that Urbana Police Department (Asst. Chief Bily) had already confiscated the tape.

22. The video included footage shot by Patrick and I between Memorial Day weekend 2004 and Aug 2004. The video included club scenes at the American Legion (Patrick taped this part), traffic stops, Campus getting out, interview of African American after he was stopped by police for allegedly shoplifting (which he hadn't done); more than five police cars; campus when the bars let out (no police- also there was a lot of jay walking, property destruction); the fair ground incident at the Champaign County Fair; Urbana Police Officer Cobb saying that the police tape people, so if the cops charge Patrick and I, they'd have to charge the officers with the same offense, and also stating that the law of not permitting audio taping is not enforced.

23. I had several interactions with Champaign, Urbana, and University police officers between Memorial Day weekend, 2004 and August 7, 2004 while I was taping the officers' interactions with local citizens.

24. Between Memorial Day weekend, 2004 and August 7, 2004, the police officers saw me taping them and talked with me while I was taping.

25. The officers with whom I spoke while I was taping between Memorial Day weekend, 2004 and August 7, 2004 included Champaign Police Officer Griffet, a named Defendant in the above-referenced lawsuit.

26. Some time between July 2004 and the first week of Aug. 2004, Officer Griffet walked up to me while I was on First Street in Champaign in front of the Masonic Lodge and started talking with me while I was taping. He talked to me as if he understood he was being audio taped.

27. I never incited any individuals while I was taping or watching Patrick Thompson tape any interactions between officers and citizens.

28. There was never more than one person taping for VEYA at a time. Other than Nikki Lambert taping a scene on the University of Illinois campus, all of the rest of the taping for VEYA was conducted by either me or Patrick Thompson.

29. I made a conscious effort to not interfere with any police/citizen action by waiting to speak with any citizens until after the police/citizen interaction had ended.

30. I reviewed Defendant Clinton's police report and have absolutely no idea what incident he is discussing on Page 2 of 6. (See EXHIBIT L, attached.)

31. On Aug 7, 2004, I videotaped a traffic stop for which James Wood was issued a citation.

32. On August 7, 2004, I was driving on Bradley Avenue when I observed two police cars and officers talking with a bicyclist, who I later found out to be James Wood. This was in the 900 Block of west Bradley Avenue in Champaign. Wood and the officers, whom I later found out to be Officers Clinton and Pyburn) were on the south side of the street. I parked my vehicle and went to the sidewalk on the north side of the street and began taping the stop that had already begun. I was approximately 60 feet away from the traffic

stop while I was taping the officers' interactions. Cars continued to travel east and west across Bradley Ave between where I was taping and the officers were talking with Wood. No voices of the officers or Wood were audible during the traffic stop.

33. After the stop ended, Officer Pyburn drove away in his car. Officer Clinton returned to his car but did not leave the scene. As Wood was leaving, I motioned for Wood to come over, which Wood did. I requested and got consent from Wood to tape an interview with Wood. The interview began. About 2-3 minutes into my interview of Wood, Officer Clinton drove over to the north side of the street and from his car, yelled at me, "Are you taping my voice right now?" As I continued the focus of his camera and the interview on Wood, I responded that Clinton was placing his voice on the tape. Clinton said to me: "You're taping my voice without my permission." An additional officer came at a high rate of speed in his vehicle and got out of his squad car.

34. This officer, who I later learned to be Officer Cleeve, told me to stop filming, so I handed the camera to Wood and told Wood to start filming me. I heard officer Cleeve tell Wood that if he didn't stop taping, he'd be arrested. I told Wood to give the camera back to me, which Wood did. I told Clinton and Cleeve that Patrick and I had been filming for two months and there had been no problem. Officer Cleeve told me that he was told recently that if any of the officers saw me or Patrick filming, to question us. I asked the officers to call a sergeant to the scene.

35. Officer Griffet arrived about ten minutes later. I heard Officer Clinton complain to Griffet that his voice was on the tape without his permission. I explained to Griffet that Clinton's voice was only on the tape during my interview of Wood. At all times that Clinton's voice was on the tape, the camera was pointed at Wood (for Wood's interview)

36. I believe that Clinton intentionally put is voice on the tape by yelling at me while I was interviewing Mr. Wood to justify an arrest, confiscation, and indictment of me.

37. I offered to show Griffet the traffic stop and Griffet viewed it. There was no audible voice of any officer or Wood during the traffic stop on the tape that Griffet viewed.

38. After viewing that portion of the tape, Griffet went back to the car and talked with Dobson for about one minute. Griffet returned and reported that Dobson told him that he could take the camera and tape.

39. I told Griffet and the other officers that the camera was no evidence, only the tape, so they should just take the tape, but Griffet ordered that both the camera and the tape should be seized.

40. When Griffit took the camera from me , I asked him if he was going to arrest me, and Griffet answered, No.

41. Officer Griffet informed us that Assistant State's Attorney Dobson, who he said was in the police car several feet away from where we were standing, had informed him that he had the right to seize both our camera and the videotape inside the camera, which he then instructed other officers to do.

42. I believe that Griffet and other officers were aware of our videotaping their actions and consented to that also because of Griffet's grand jury testimony in which he states that he and other officers have been aware that there were citizen watch groups watching police actions and police interaction with citizens, and that no one had expressed any concern

about that taping until the night of August 7, 2004.

43.  The only voice other than mine and Wood's on the tape that Griffet viewed was the part where Clinton yelled at Martel while he was interviewing Wood. There was no voice of Wood or an officer audible when Griffet viewed.

44.  Clinton explained on Aug 7, 2004 that he had been instructed to talk with us if he or other officers saw us taping them. This is also evident from his police report. (See EXHIBIT L, attached hereto.)

45.  On Monday August 9, 2004, I was with Patrick Thompson when I received a call on his cell phone.

46.  The call was from the Champaign Police Department. The speaker told me that they wanted me to come into the station that day.

47.  Attorney Ratcliffe met me and Patrick Thompson at the Champaign Police Department that day.

48.  At the Champaign Police Department, Attorney Ratcliffe and Patrick went into the conference room and met with Lieutenant Yohnka and another officer and discussed the videotaping that had taken place while I stayed in the lobby because I was not permitted to be in the conference with the police.

49.  On August 23, 2004, I was arraigned by the Court in the State's eavesdropping case against me. I had previously been issued a summons to appear in Court on that date.

50.  On September 2, 2004, I was charged by the Champaign County State's Attorney's office with three counts of Eavesdropping. (A copy of the Indictment is attached hereto as EXHIBIT D)

51.  Until the video tape and hand-held recorder was confiscated on August 7, 2004, I had never been warned or told by any officer that they objected to my taping them.

52.  No officer ever told me not to tape them.

53.  On September 24, 2004, the State filed a Motion to Dismiss and an Affidavit, both signed by Assistant State's Attorney Elizabeth Dobson. See EXHIBIT E, attached.

54.  That on that same date, the cause was ordered dismissed and stricken.

55.  When I got the camera and tape back from the police, I viewed the tape and believe that it was altered.

56.  The video recording I made of the University of Illinois police stop of a motorcyclist on August 7, 2004 was made from a distance of about 20 feet. I did not interfere at all with the interactions of the police and the motorcyclist.

57.  I believe that the decision to charge me with eavesdropping was made by the Champaign police department, and that belief is based in part of the admission of Elizabeth Dobson, Lead Prosecutor, who states in her State's Motion to Dismiss the case against me (People v. E. Martel Miller, 04-CF-1482, filed Sept. 24, 2004) and the Affidavit in Support of the Motion to Dismiss, filed with the State's Motion to Dismiss. [See EXHIBITS A and B, attached.] I also believe, based on Defendant John C. Piland's press release stating that

the "charges were filed at the request of the Champaign Police Department and only after command staff had the opportunity to review their case." (Emphasis in original).See EXHIBIT E.  Also Defendant Piland's Press Release specifically names Defendants Swenson, Daniels of the Champaign Police Department, but also references Champaign Police Department 'Command Staff' as having first hand knowledge of Champaign Police Department's decision to prosecute.

58.    I believe that the decision to prosecute Patrick and I was made to keep us from monitoring the police, and that Defendants chose to go after Patrick and I specifically, as Dobson states in her grand jury statement in the cases against me and Patrick for eavesdropping, "So, again, wtih regard to taping your kids, go ahead." [See EXHIBIT F, page 8,attached).

59.    On August 24, 2004, I went to the UPTV office in the City Building of the City of Urbana and asked to retrieve the videotape I had given to Chris Foster the previous day. He told me that his boss, Steve Holz, had taken the tape from him.  I then spoke with Police Chief Adair, and when I returned less than an hour later to speak with Chris Foster again, he told me that he had checked with Steve Holz, and had been told that Assistant Police Chief Bily had the tape.

60.    Because David Griffet, a Defendant in this case, includes in his police report CC0410399 that he was made aware of the UPTV tape by Urbana Police Lieutenant Mike Metzler about one week before the date of the report (dated 9/3/04) who had reviewed the tape, I believe that the actions of Bily to confiscate the tape kept the video from being aired on UPTV. (See EXHIBIT C, attached.)  Additionally, no subpoena for the tape was issued until August 31, 2004 (See Subpoena Duces Tecum, Filed August 31, 2004, attached as EXHIBIT D)

61.    Once the charges against me were dropped, the same video tape that had been confiscated by Assistant Chief Bily of the Urbana Police Department was shown to packed crowds of hundreds of people at the local Art Theater, Champaign Public Library, Smith Hall at the University of Illinois campus, and other locations, all without incident and without threat of prosecution. (See newspaper clippings attached as EXHIBIT G)

59.    After eavesdropping charges were dismissed, the same tape submitted to UPTV was aired on multiple occasions without any threat.

60.    Griffet actually took the camcorder out of my hand after he went to his car.  Patrick arrived a few minutes after Griffet took the camcorder out of my hand.

61.    The tape has since been broadcast to a full house at the Art Theater and submitted to UPTV at Smith Hall on the U of I campus to 500 people.

62.    On August 24, 2004 Christ Foster told me he had not received a subpoena for the tape.

63.    When I returned on August 24, 2004 to retrieve the tape from UPTV, Chris Foster told me that his supervision, Steve Holz, had taken the video tape.  Chris told me that the videotape had been taken by Mike Bily.

64.    I believe that the decision to go after Patrick and I was due in part to the fact that we got the two of them either on tape or were seen together at two separate traffic stops (June 29 and August 7)

65.    Griffet told me that Dobson told him he could take the tape and camera from me.

FURTHER AFFIANT SAYETH NOT.

/s

Martel Miller

Champaign County )
State of Illinois )
Subscribed and Sworn to before me this 24 day of November, 2006.

/s Ruth Wyman

Notary Public

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MARTEL MILLER and PATRICK THOMPSON, VEYA, INC., )
)
Plaintiffs, )
)
v. ) 05-2142
) JURY DEMAND
CITY OF CHAMPAIGN, CITY MANAGER STEVE CARTER, )
CITY ATTORNEY FRED STAVINS, CHIEF OF POLICE R.T. )
FINNEY, DEPUTY CHIEF JOHN MURPHY, DEPUTY CHIEF )
TROY DANIELS, LT. JOHN SWENSON, SGT. DAVID )
GRIFFET, OFFICER JUSTUS CLINTON, OFFICER MICHAEL )
PYBURN, and UNKNOWN OFFICER, All in Their Individual )
and Official Capacity, CHAMPAIGN COUNTY, STATE'S )
ATTORNEY JOHN PILAND, ASST. STATES ATTORNEY )
ELIZABETH DOBSON, All in Their Individual and Official )
Capacity, CITY OF URBANA, ASSISTANCE CHIEF OF )
POLICE MIKE BILY, All in Their Individual and Official )
Capacity, )
)
Defendants. )

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of November, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Howard W. Small hwslaw@shout.net

David E. Krchak krchak@tmh-law.com

James D. Green jim@tmh-law.com

Jerome P. Lyke jeromelyke@yahoo.com

As well as a courtesy copy of the Exhibits uploaded this date in paper format to the Honorable Harold A. Baker, United States Federal Court, 201 S. Vine, Urbana, IL 61801 by depositing it in the United States mail in Champaign, Illinois with the complete address showing on the envelope and proper postage prepaid and provided a copy of this Certificate of Service to Howard W. Small, David E. Krchak, James D. Green, and Jerome P. Lyke by electronically filing the certificate of service with the Clerk of the Court using the CM/ECF system.

Howard W. Small        hwslaw@shout.net

David E. Krchak        krchak@tmh-law.com

James D. Green         jim@tmh-law.com

Jerome P. Lyke         jeromelyke@yahoo.com


**By: s/ Robert G. Kirchner**

Robert G. Kirchner

One of the Attorneys for Plaintiffs

100 Trade Centre Drive, Suite 402

Champaign, IL 61820

Phone: (217) 355-5660

Facsimile: (217) 355-5675

E-mail: rgk-kirchnerlaw@sbcglobal.net

**By: s/ Ruth E. Wyman**

Ruth E. Wyman Bar Number: 6284294

One of the Attorneys for the Plaintiff

Robert G. Kirchner Law Office

100 Trade Centre Drive, Suite 402

Champaign, IL 61820

Phone: 217-355-5660

Facsimile: 217-355-5675

E-mail: rw-kirchnerlaw@sbcglobal.net