UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MARTEL MILLER and PATRICK THOMPSON, VEYA, INC., )
)
Plaintiffs, )
)
)
v. ) 05-2142
) JURY DEMAND
CITY OF CHAMPAIGN, CITY MANAGER STEVE CARTER, )
CITY ATTORNEY FRED STAVINS, CHIEF OF POLICE R.T. )
FINNEY, DEPUTY CHIEF JOHN MURPHY, DEPUTY CHIEF )
TROY DANIELS, LT. JOHN SWENSON, SGT. DAVID )
GRIFFET, OFFICER JUSTUS CLINTON, OFFICER MICHAEL )
PYBURN, and UNKNOWN OFFICER, All in Their Individual )
and Official Capacity, CHAMPAIGN COUNTY, STATE'S )
ATTORNEY JOHN PILAND, ASST. STATES ATTORNEY )
ELIZABETH DOBSON, All in Their Individual and Official )
Capacity, CITY OF URBANA, ASSISTANCE CHIEF OF )
POLICE MIKE BILY, All in Their Individual and Official )
Capacity, )
)
Defendants. )

### AFFIDAVIT OF MARTEL MILLER

I, MARTEL MILLER, under penalty of perjury under 28 U.S.C. §1746, state that the following is true and accurate; and if called upon to testify, my testimony would be as follows:

1. I am one of the named Plaintiffs in the above-referenced lawsuit.

2. I am a co-founder of VEYA Foundation, which stands for Visionaries Educating Youths and Adults.

3. VEYA was incorporated on May 3, 2004.

4. On or about March 26, 2004, Patrick Thompson, one of the named Plaintiffs in the above-referenced cases (hereinafter 'Patrick) and I mailed correspondence addressed to Champaign Police Chief Finney explaining that our organization would be monitoring


PLAINTIFF'S EXHIBIT A

the police.

5. The letter includes the following statement: "If you have any questions or concerns, you may contact us at: veya@lists.cu.groogroo.com" I have access to this email address and was never contacted by anyone listing any concerns or objections to being taped.

6. No one ever contacted me after this letter was sent about any concerns they had about monitoring the police or our project.

7. The correspondence mailed to Police Chief Finney was signed by me, and a copy of that correspondence was mailed on or about March 26, 2004 to City of Champaign Mayor Gerald Schweighart and City of Champaign City Manager Steve Carter.

8. A true and exact copy of that correspondence is attached as EXHIBIT A.

9. Between March 26, 2004 and May 1, 2004, I and Patrick Thompson met with Mayor Schweighart and spoke with him regarding our intention to begin taping police and citizen interactions. Mayor Schweighart said he did not have any objection to us taping police and citizen interactions.

10. At the community forum we held in early May, 2004, which was attended by several Champaign Police Department officers as well as community members, Patrick and I discussed our intention to monitor the police. Several Champaign Police Department officers were present, including officer Griffet.

11. Between May and June 2004, a video of our forum ran on UPTV.

12. Before taping of the police and citizen interactions began, Patrick and I met with Mayor Schweighart, who asked us what our letter was about. We told him that we were going t to videotape police and citizen interactions, and he responded that he had no problem with that.

13. Based on our correspondence to Chief Finney on March 26, 2004, our interactions with the officers being out in public taping the officers interactions, and the officers acknowledgment of us taping them, including Officer Clinton telling me that if any of the officers saw us taping, they were instructed to talk with us (See Exhibit J).

14. On about August 22, 2004, Patrick and I finished editing the CitizenWatch videotape for viewing on UPTV.

15. I and Patrick Thompson put together and I have viewed the entire videotape submitted to Urbana Public Television on August 23, 2004 and am familiar with its contents.

16. The video tape created by Patrick Thompson and I and submitted to Urbana Public Television for viewing on the public access channel (hereinafter 'UPTV tape') included taping between Memorial Day weekend, 2004 and August 7, 2004.

17. The UPTV tape includes Officer Griffet telling me he doesn't mind me taping him.

18. The UPTV tape also includes footage of Officer Griffet waving at the camera and walking toward me, and telling me that he was curious about the videotaping and that he did not feel that we were doing anything improper.

19. The UPTV tape shows Officer Griffet asking Martel about what he was doing and referring to the videotaping that Martel was conducting at the time and Officer Griffet

stating to Martel that he had no problem with the taping that was taking place.

20. I turned the video in to Chris Foster at UPTV on 8/23/04.

21. When I returned to pick up the tape from UPTV on 8/24/04, Christ Foster told me that Urbana Police Department (Asst. Chief Bily) had already confiscated the tape.

22. The video included footage shot by Patrick and I between Memorial Day weekend 2004 and Aug 2004. The video included club scenes at the American Legion (Patrick taped this part), traffic stops, Campus getting out, interview of African American after he was stopped by police for allegedly shoplifting (which he hadn't done); more than five police cars; campus when the bars let out (no police- also there was a lot of jay walking, property destruction); the fair ground incident at the Champaign County Fair; Urbana Police Officer Cobb saying that the police tape people, so if the cops charge Patrick and I, they'd have to charge the officers with the same offense, and also stating that the law of not permitting audio taping is not enforced.

23. I had several interactions with Champaign, Urbana, and University police officers between Memorial Day weekend, 2004 and August 7, 2004 while I was taping the officers' interactions with local citizens.

24. Between Memorial Day weekend, 2004 and August 7, 2004, the police officers saw me taping them and talked with me while I was taping.

25. The officers with whom I spoke while I was taping between Memorial Day weekend, 2004 and August 7, 2004 included Champaign Police Officer Griffet, a named Defendant in the above-referenced lawsuit.

26. Some time between July 2004 and the first week of Aug. 2004, Officer Griffet walked up to me while I was on First Street in Champaign in front of the Masonic Lodge and started talking with me while I was taping. He talked to me as if he understood he was being audio taped.

27. I never incited any individuals while I was taping or watching Patrick Thompson tape any interactions between officers and citizens.

28. There was never more than one person taping for VEYA at a time. Other than Nikki Lambert taping a scene on the University of Illinois campus, all of the rest of the taping for VEYA was conducted by either me or Patrick Thompson.

29. I made a conscious effort to not interfere with any police/citizen action by waiting to speak with any citizens until after the police/citizen interaction had ended.

30. I reviewed Defendant Clinton's police report and have absolutely no idea what incident he is discussing on Page 2 of 6. (See EXHIBIT L, attached.)

31. On Aug 7, 2004, I videotaped a traffic stop for which James Wood was issued a citation.

32. On August 7, 2004, I was driving on Bradley Avenue when I observed two police cars and officers talking with a bicyclist, who I later found out to be James Wood. This was in the 900 Block of west Bradley Avenue in Champaign. Wood and the officers, whom I later found out to be Officers Clinton and Pyburn) were on the south side of the street. I parked my vehicle and went to the sidewalk on the north side of the street and began taping the stop that had already begun. I was approximately 60 feet away from the traffic

33. stop while I was taping the officers' interactions. Cars continued to travel east and west across Bradley Ave between where I was taping and the officers were talking with Wood. No voices of the officers or Wood were audible during the traffic stop.

33. After the stop ended, Officer Pyburn drove away in his car. Officer Clinton returned to his car but did not leave the scene. As Wood was leaving, I motioned for Wood to come over, which Wood did. I requested and got consent from Wood to tape an interview with Wood. The interview began. About 2-3 minutes into my interview of Wood, Officer Clinton drove over to the north side of the street and from his car, yelled at me, "Are you taping my voice right now?" As I continued the focus of his camera and the interview on Wood, I responded that Clinton was placing his voice on the tape. Clinton said to me: "You're taping my voice without my permission." An additional officer came at a high rate of speed in his vehicle and got out of his squad car.

34. This officer, who I later learned to be Officer Cleeve, told me to stop filming, so I handed the camera to Wood and told Wood to start filming me. I heard officer Cleeve tell Wood that if he didn't stop taping, he'd be arrested. I told Wood to give the camera back to me, which Wood did. I told Clinton and Cleeve that Patrick and I had been filming for two months and there had been no problem. Officer Cleeve told me that he was told recently that if any of the officers saw me or Patrick filming, to question us. I asked the officers to call a sergeant to the scene.

35. Officer Griffet arrived about ten minutes later. I heard Officer Clinton complain to Griffet that his voice was on the tape without his permission. I explained to Griffet that Clinton's voice was only on the tape during my interview of Wood. At all times that Clinton's voice was on the tape, the camera was pointed at Wood (for Wood's interview)

36. I believe that Clinton intentionally put is voice on the tape by yelling at me while I was interviewing Mr. Wood to justify an arrest, confiscation, and indictment of me.

37. I offered to show Griffet the traffic stop and Griffet viewed it. There was no audible voice of any officer or Wood during the traffic stop on the tape that Griffet viewed.

38. After viewing that portion of the tape, Griffet went back to the car and talked with Dobson for about one minute. Griffet returned and reported that Dobson told him that he could take the camera and tape.

39. I told Griffet and the other officers that the camera was no evidence, only the tape, so they should just take the tape, but Griffet ordered that both the camera and the tape should be seized.

40. When Griffit took the camera from me, I asked him if he was going to arrest me, and Griffet answered, No.

41. Officer Griffet informed us that Assistant State's Attorney Dobson, who he said was in the police car several feet away from where we were standing, had informed him that he had the right to seize both our camera and the videotape inside the camera, which he then instructed other officers to do.

42. I believe that Griffet and other officers were aware of our videotaping their actions and consented to that also because of Griffet's grand jury testimony in which he states that he and other officers have been aware that there were citizen watch groups watching police actions and police interaction with citizens, and that no one had expressed any concern

about that taping until the night of August 7, 2004.

43. The only voice other than mine and Wood's on the tape that Griffet viewed was the part where Clinton yelled at Martel while he was interviewing Wood. There was no voice of Wood or an officer audible when Griffet viewed.

44. Clinton explained on Aug 7, 2004 that he had been instructed to talk with us if he or other officers saw us taping them. This is also evident from his police report. (See EXHIBIT L, attached hereto.)

45. On Monday August 9, 2004, I was with Patrick Thompson when I received a call on his cell phone.

46. The call was from the Champaign Police Department. The speaker told me that they wanted me to come into the station that day.

47. Attorney Ratcliffe met me and Patrick Thompson at the Champaign Police Department that day.

48. At the Champaign Police Department, Attorney Ratcliffe and Patrick went into the conference room and met with Lieutenant Yohnka and another officer and discussed the videotaping that had taken place while I stayed in the lobby because I was not permitted to be in the conference with the police.

49. On August 23, 2004, I was arraigned by the Court in the State's eavesdropping case against me. I had previously been issued a summons to appear in Court on that date.

50. On September 2, 2004, I was charged by the Champaign County State's Attorney's office with three counts of Eavesdropping. (A copy of the Indictment is attached hereto as EXHIBIT D)

51. Until the video tape and hand-held recorder was confiscated on August 7, 2004, I had never been warned or told by any officer that they objected to my taping them.

52. No officer ever told me not to tape them.

53. On September 24, 2004, the State filed a Motion to Dismiss and an Affidavit, both signed by Assistant State's Attorney Elizabeth Dobson. See EXHIBIT E, attached.

54. That on that same date, the cause was ordered dismissed and stricken.

55. When I got the camera and tape back from the police, I viewed the tape and believe that it was altered.

56. The video recording I made of the University of Illinois police stop of a motorcyclist on August 7, 2004 was made from a distance of about 20 feet. I did not interfere at all with the interactions of the police and the motorcyclist.

57. I believe that the decision to charge me with eavesdropping was made by the Champaign police department, and that belief is based in part of the admission of Elizabeth Dobson, Lead Prosecutor, who states in her State's Motion to Dismiss the case against me (People v. E. Martel Miller, 04-CF-1482, filed Sept. 24, 2004) and the Affidavit in Support of the Motion to Dismiss, filed with the State's Motion to Dismiss. [See EXHIBITS A and B, attached.] I also believe, based on Defendant John C. Piland's press release stating that

the "charges were filed at the <u>request</u> of the Champaign Police Department and only after command staff had the opportunity to review their case." (Emphasis in original).See EXHIBIT E. Also Defendant Piland's Press Release specifically names Defendants Swenson, Daniels of the Champaign Police Department, but also references Champaign Police Department 'Command Staff' as having first hand knowledge of Champaign Police Department's decision to prosecute.

58. I believe that the decision to prosecute Patrick and I was made to keep us from monitoring the police, and that Defendants chose to go after Patrick and I specifically, as Dobson states in her grand jury statement in the cases against me and Patrick for eavesdropping, "So, again, wtih regard to taping your kids, go ahead." [See EXHIBIT F, page 8,attached).

59. On August 24, 2004, I went to the UPTV office in the City Building of the City of Urbana and asked to retrieve the videotape I had given to Chris Foster the previous day. He told me that his boss, Steve Holz, had taken the tape from him. I then spoke with Police Chief Adair, and when I returned less than an hour later to speak with Chris Foster again, he told me that he had checked with Steve Holz, and had been told that Assistant Police Chief Bily had the tape.

60. Because David Griffet, a Defendant in this case, includes in his police report CC0410399 that he was made aware of the UPTV tape by Urbana Police Lieutenant Mike Metzler about one week before the date of the report (dated 9/3/04) who had reviewed the tape, I believe that the actions of Bily to confiscate the tape kept the video from being aired on UPTV. (See EXHIBIT C, attached.) Additionally, no subpoena for the tape was issued until August 31, 2004 (See Subpoena Duces Tecum, Filed August 31, 2004, attached as EXHIBIT D)

61. Once the charges against me were dropped, the same video tape that had been confiscated by Assistant Chief Bily of the Urbana Police Department was shown to packed crowds of hundreds of people at the local Art Theater, Champaign Public Library, Smith Hall at the University of Illinois campus, and other locations, all without incident and without threat of prosecution. (See newspaper clippings attached as EXHIBIT G)

59. After eavesdropping charges were dismissed, the same tape submitted to UPTV was aired on multiple occasions without any threat.

60. Griffet actually took the camcorder out of my hand after he went to his car. Patrick arrived a few minutes after Griffet took the camcorder out of my hand.

61. The tape has since been broadcast to a full house at the Art Theater and submitted to UPTV at Smith Hall on the U of I campus to 500 people.

62. On August 24, 2004 Christ Foster told me he had not received a subpoena for the tape.

63. When I returned on August 24, 2004 to retrieve the tape from UPTV, Chris Foster told me that his supervision, Steve Holz, had taken the video tape. Chris told me that the videotape had been taken by Mike Bily.

64. I believe that the decision to go after Patrick and I was due in part to the fact that we got the two of them either on tape or were seen together at two separate traffic stops (June 29 and August 7)

65. Griffet told me that Dobson told him he could take the tape and camera from me.

FURTHER AFFIANT SAYETH NOT.

*Martel Miller*
Martel Miller


Champaign County    )
State of Illinois         )
Subscribed and Sworn to before me this 24 day of November, 2006.

*Ruth E. Wyce*
Notary Public