UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MARTEL MILLER and PATRICK THOMPSON, VEYA, INC., )
)
Plaintiffs, )
)
)
v. ) 05-2142
) JURY DEMAND
)
CITY OF CHAMPAIGN, CITY MANAGER STEVE CARTER, )
CITY ATTORNEY FRED STAVINS, CHIEF OF POLICE R.T. )
FINNEY, DEPUTY CHIEF JOHN MURPHY, DEPUTY CHIEF )
TROY DANIELS, LT. JOHN SWENSON, SGT. DAVID )
GRIFFET, OFFICER JUSTUS CLINTON, OFFICER MICHAEL )
PYBURN, and UNKNOWN OFFICER, All in Their Individual )
and Official Capacity, CHAMPAIGN COUNTY, STATE'S )
ATTORNEY JOHN PILAND, ASST. STATES ATTORNEY )
ELIZABETH DOBSON, All in Their Individual and Official )
Capacity, CITY OF URBANA, ASSISTANCE CHIEF OF )
POLICE MIKE BILY, All in Their Individual and Official )
Capacity, )
)
)
Defendants. )

### AFFIDAVIT OF PATRICK THOMPSON

I, PATRICK THOMPSON, under penalty of perjury under 28 U.S.C. §1746, state that the following is true and accurate; and if called upon to testify, my testimony would be as follows:

1. I am one of the named Plaintiffs in the above-referenced lawsuit.
2. I am a President and co-founder of VEYA Foundation, which stands for Visionaries Educating Youths and Adults.



PLAINTIFF'S EXHIBIT B

3. VEYA was incorporated on May 3, 2004.

4. On or about March 26, 2004, Martel Miller, one of the named Plaintiffs in the above-referenced cases (hereinafter 'Martel') and I mailed correspondence addressed to Champaign Police Chief Finney explaining that our organization would be monitoring the police.

5. The letter includes the following statement: "If you have any questions or concerns, you may contact us at: veya@lists.cu.groogroo.com"

6. I have access to the email listed above, checked it regularly, and never received any comments from any officers, the City, or anyone else raising any concerns or questions about the videotaping.

7. No one ever contacted me after this letter was sent about any concerns they had about monitoring the police or our project.

8. The correspondence mailed to Police Chief Finney was signed by Martel Miller, and a copy of that correspondence was mailed on or about March 26, 2004 to City of Champaign Mayor Gerald Schweighart and City of Champaign City Manager Steve Carter.

9. A true and exact copy of that correspondence is attached as EXHIBIT A.

10. On or about the first of May, 2004, Martel Miller and I held a public forum at which we discussed our project to monitor police and citizen interactions. Many officers and other community members were present at the forum. I believe I told the audience that we were going to be taping interactions between the police and citizens, and putting it on UPTV. I specifically remember officer Griffet in attendance at the forum.

11. The forum that we held on our program to monitor police and citizen interactions was broadcast on UPTV from May through June, 2004.

12. At no time did any of the officers, including those present at the forum, or any other public official present at the forum, voice any displeasure or objection to our intent to tape the police interactions with local citizens until our tape and camcorder were confiscated on August 7, 2004.

13. Prior to beginning our videotaping, Martel and I met with Mayor Schweighart. He asked us what the letter that we sent him (on March 26, 2004) was about, and Martel and I told him that we were going to be taping the police interactions with citizens. Mayor Schweighart said he didn't have any problem with us doing that.

14. Between March 26, 2004 and May 1, 2004, I and Martel Miller met with Mayor Schweighart and spoke with him regarding our intention to begin taping police and citizen interactions and Mayor Schweighart didn't make any statement that he did not want the police being taped.

15. I had several interactions with Champaign, Urbana, and University police officers between Memorial Day Weekend, 2004 and August 7, 2004 while I was taping the

officers' interactions with local citizens.

16. Between Memorial Day Weekend, 2004 and August 7, 2004, the police officers saw me taping them and talked with me while I was taping.

17. The officers with whom I spoke while I was taping between Memorial Day Weekend, 2004 and August 7, 2004 included Champaign Police Officer Griffet, a named Defendant in the above-referenced lawsuit, and Urbana Police Officer Anthony Cobb.

18. I never incited any individuals while I was taping or watching Martel Miller tape any interactions between officers and citizens.

19. There was never more than one person taping for VEYA at a time. Other than Nikki Lamers taping a scene on the University of Illinois campus, all of the rest of the taping for VEYA was conducted by either me or Martel Miller.

20. I made a conscious effort to not interfere with any police/citizen action by waiting to speak with any citizens until after the police/citizen interaction had ended.

21. Throughout our taping of police interactions with local citizens, we conducted ourselves out in the open where everyone could see us and could see what we were doing. We also took precaution to not interfere with any of the officers' interactions with the citizens by waiting to interview citizens, and even talk with officers, until after the officers had concluded their interactions with the citizens.

22. Throughout our interactions with the police – from our letter to Chief Finney, our conversation with the Mayor, our conversations with various police officers including Officer Griffet, and the lack of any communication from any officer noting any dissent made me believe that I had permission to video and audio record the officers' interactions, including Officer Griffet's.

23. I put together and have viewed the entire videotape submitted to Urbana Public Television on August 23, 2004 and am familiar with its contents.

24. The video tape created by Martel and I and submitted to Urbana Public Television for viewing on the public access channel (hereinafter 'UPTV tape') included taping between Memorial Day Weekend, 2004 and August 7, 2004.

25. The UPTV tape includes Officer Griffet telling Martel he doesn't mind Martel taping him.

26. The UPTV tape also includes footage of Griffet waving at the camera and walking toward Martel, and telling Martel that he was curious about the videotaping and that he did not feel that they were doing anything improper.

27. The UPTV tape shows Officer Griffet asking Martel about what he was doing and referring to the videotaping that Martel was conducting at the time and Officer Griffet stating to Martel that he had no problem with the taping that was taking place.

28. No officer ever told me not to tape them.

29. At the community forum we held in early May, 2004, which was attended by several Champaign Police Department officers as well as community members, Martel Miller

and I discussed our intention to monitor the police and begin taping the interactions and that the taping would be broadcast on UPTV (Urbana Public Television public access channel).

30. On about August 22, 2004, Martel and I finished editing the CitizenWatch videotape for viewing on UPTV.

31. The video included footage shot by Martel and I between May 2004 and Aug 2004. The video included club scenes at the American Legion (Patrick taped this part), traffic stops, Campus getting out, interview of African American after he was stopped by police for allegedly shoplifting (which he hadn't done); more than five police cars; campus when the bars let out (no police- also there was a lot of jay walking, property destruction); the fair ground incident at the Champaign County Fair; Urbana Police Officer Cobb saying that the police tape people, so if the cops charge Martel and Patrick, they'd have to charge the officers with the same offense, and also stating that the law of not permitting audio taping is not enforced.

32. During the filming of the fair grounds, another Urbana Officer, whose name I do not know, stated that I had the right to videotape the youths, who were expressing displeasure with me videotaping.

33. Neither the officer nor the individual being stopped and questioned by the police can be heard on the UPTV video in which two traffic stops are shown including the traffic stop in front of Mac's at 601 N. Neil Street in Champaign, Illinois.

34. Until August 7th, when Griffet ordered that our camcorder and videotape be confiscated, I was not aware that any of the officers or the administration did not approve of or consent to our taping of the officers.

35. In the late evening hours of August 7, 2004, I received a phone call from Martel Miller, one of the named Plaintiffs in the above-referenced lawsuit.

36. Martel indicated to me that he was speaking with police officers who were trying to confiscate our hand-held video recorder and the videotape inside the recorder.

37. I arrived at the location where Martel Miller and several other officers, including Officer Griffet of the Champaign Police Department were standing.

38. When Officer Griffet told Martel and I that he was going to seize the camcorder and video, I objected to the seizure of our property.

39. I was upset that the police were going to take our video recorder and video tape and I asked if the officers had a warrant.

40. The officers responded that they did not have a warrant to seize the video recorder or the video tape.

41. Officer Griffet informed us that Assistant State's Attorney Dobson, who he said was in the police car several feet away from where we were standing, had informed him that he had the right to seize both our camera and the videotape inside the camera, which he then

42. I never swore or yelled at Officer Griffet on August 7, 2004.
43. Until the video tape and hand-held recorder was confiscated on August 7, 2004, I had never been warned or told by any officer that they objected to us taping them.

44. On June 29, 2004, at approximately 2 am, I was standing in the parking lot of Mac's, and videotaped a traffic stop that involved three officers. I was more than 100 feet away from the traffic stop while I was taping the stop. As I was taping the traffic stop, a crowd began to form in front of Mac's. Within thirty seconds of finishing my filming of the traffic stop, I turned the camera toward the crowd forming at Mac's. I began taping the crowd and had conversations while I was taping, with some of the people in the crowd. While I was taping, I also saw and videotaped Elizabeth Dobson videotaping the same scene of events that I was taping. I do not know if she was recording any voices because I have not seen the videotape she made. During my taping, I noticed Officer Griffet yelling at a man whose name I later learned to be Allen Wilson. They did not appear to be having a private conversation, since Griffet was yelling and swearing at him, and Mr. Wilson was yelling back. At one point in their conversation, you can hear Allen referring to Griffet having 'his boys', referring to the officers), look like they were ready to jump him (Mr. Wilson). Two other officers were present and in the crowd that I was taping. Despite my presence with my camcorder, none of the officers, including Officer Griffet, nor Assistant State's Attorney Dobson, asked me to stop taping them or the scene.
45. I later interviewed Allen Wilson on videotape about the incident on June 29th at Mac's. He never objected to being filmed.
46. In addition to taping Griffet on June 29, 2004 at Mac's, I have videotaped him on two other occasions since June 29, 2004. Despite these three times that I videotaped him and he was aware of my taping him, he never approached me or otherwise contacted me to request that I not audio or video tape him or to even suggest any displeasure at my taping of him and his interactions with other people.

47. I reviewed Defendant Clinton's police report and have absolutely no idea what incident he is discussing on Page 2 of 6. (See EXHIBIT L, attached.)
48. On Monday August 9, 2004, I was with Martel Miller when he received a call on his cell phone.
49. Martel told me that the call was from the Champaign police and that they wanted Martel to come into the station that day.
50. I called Attorney Bruce Ratcliffe and told him about the phone call from the Champaign Police that Martel had received.
51. Attorney Ratcliffe met Martel and I at the Champaign Police Department that day.
52. At the Champaign Police Department, Attorney Ratcliffe and I went into the conference

room and met with Lieutenant Yohnka and another officer and discussed the videotaping that had taken place.

53. On August 23, 2004, I attended the court hearing in Champaign County Court where Martel was charged with three counts of eavesdropping.

54. The following day, August 24, 2004, I was arrested on other issues that allegedly occurred that same day and charged in Champaign County case 04-CF-1609.

55. On September 2, 2004, I was charged by the Champaign County State's Attorney's office with Eavesdropping. (A copy of the Indictment is attached hereto as EXHIBIT G)

56. On September 8, 2004 I appeared in Court and entered a plea of not guilty.

57. On September 8, 2004, my appointed attorney requested that I be released on my own recognizance, but that request was denied.

58. On December 1, 2004, the first day of newly-elected State's Attorney Julia Rietz term, the State moved to dismiss the charge against me and the cause was ordered dismissed and stricken.

59. I believe that the charges were filed against me at least in part in retaliation for my filming Dobson on June 29, 2004, when she was filming the same crowd that I was filming and for exposing Dobson's ride alongs with Griffet. According to news articles, Dobson stopped doing 'ridealongs' after Martel and I were charged with eavesdropping.

60. I have been harassed by Champaign police officers on numerous occasions.

61. On approximately October 9, 2004, I was stopped in front of the Illini Union, 1401 W. Green Street, Urbana, Illinois around 1:30 am - 2 am.

62. The officer that pulled me over told me that he pulled me over because he though I was not wearing a seatbelt.

63. I was driving an older model vehicle that has the seat low and back.

64. At that late hour and in the vehicle I was driving at the time, there was no way that the officer could see from his squad car whether or not my seatbelt was on.

65. I witnessed the officer follow me from Fourth Street and Green Street in Champaign several blocks to the Illini Union before he put his lights on to pull me over.

66. I asked the officer asked why he pulled me over and the officer responded that he pulled me over because I was not wearing my seat belt.

67. When I showed the officer that I was wearing my seat belt and so was not violating the seat belt law, he stated that my seatbelt was not properly on and this is why he was pulling me over.

68. An additional squad car then came to the scene.

69. I showed the officer that I had an permit that allowed me to drive.

70. The officer then returned to his squad car and 'ran' my name and came back and told me

that I was under arrest for driving on a revoked license.

71. I responded that he was pulling me over because of my race, to which he responded by saying to me that I was a drug dealer.

72. I was taken to jail and posted $100 to bail out of jail.

73. I filed a complaint with the Champaign Police Department for the officer's treatment of me, but the response I received back was that the police had done nothing wrong.

74. The State's attorney later dismissed the charge against me for driving while revoked.

75. I was harassed again by the Champaign police on or about December 27, 2003 around midnight when I was alone in the parking lot next to the High Dive on Main Street in downtown Champaign.

76. My car was stopped as I was waiting for other cars to move in the parking lot.

77. I had my windows rolled up, as it was cold.

78. While I was drinking tea out of a black cup as I sat waiting in my car, Officer Griffet walked up to my car. I rolled down the window because I saw officer Griffet wanted to speak with me. He asked me if the cup I was drinking from was a that was a 40 oz mug.

79. I showed him the cup of tea.

80. Officer Griffet didn't ask me my name, nor request any identification from me and I didn't offer him my name.

81. Shortly after my interaction with Officer Griffet, I pulled out of parking lot, turned right (west) onto Main Street. When I arrived near the intersection of Neil Street where Main Street turns into Church, I pulled into the parking lot at Church and Neil. At that point, I noticed that I was being followed by Champaign Police officers. I proceeded on and drove on Hill Street, then turned left on Neil Street and east on Main Street. At that point, another officer pulled in behind me (the other officer who had been following me had stopped following me). As I arrived near the High Dive on Main Street, the officer that had been following me turned on his over-head lights and pulled me over in front of old train station. The officer, who I soon found out was Officer Lack) pulled in behind me, exited his squad car and walked up to my car. The officer flashed his light in my face and around car. The officer asked me for my driver's license, insurance and registration. I asked the officer what I was being pulled over for. The officer responded to me by saying something like there was a problem with my rear license plate. I told him the rear license plate light was on. The officer disagreed and issued me a 'warning'. After I received the warning ticket, Officer Lack left the scene and I drove away as well.

82. I filed a complaint regarding the officers' treatment of me with the Champaign Police Department. A copy of that complaint was filed as #8-3 in this case.

83. The response I received acknowledged that there was no problem with my rear license plate light, but denied that the officers did anything wrong. A copy of the correspondence from the City of Champaign regarding my complaints dated February 5, 2004, was filed as #8-3 in this case.

84. I feel that the officers' following me and pulling me over for alleged traffic violations that I did not commit is racial harassment because of my race, African American, and color, black.

85. Because several officers have been a part of this harassment of me, I believe that these incidents were instituted by the Champaign police department as part of the department's racial profiling and in an attempt to harass him because of his race, African American, and his color, black.

FURTHER AFFIANT SAYETH NOT.

*Patrick Thompson*
Patrick Thompson

OFFICIAL SEAL
RUTH E. WYMAN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10/04/08

Champaign County  )
State of Illinois  )

Subscribed and Sworn to before me this 29 day of November, 2006.

*Ruth E. Wyman*
Notary Public